**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

JENNIFER BACON;
ZACH FELDMAN;
GILBERT GRANADOS;
CATHERINE HERRERA;
HARRISON KAUFMAN;
JEREMY LINTON;
ERIN MATANIC;
DANIELLE RAY; and
RACHEL VACCARO,[1]

*Plaintiffs*,

*v.*

KASHYAP P. PATEL,
in his official capacity as
Director of the Federal Bureau of Investigation
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, D.C. 20535;

FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Avenue, NW
Washington, D.C. 20535;

TODD BLANCHE,
in his official capacity as
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, D.C. 20530;

and

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, D.C. 20530,

*Defendants*.

Civil Action No. __________

[1] Pursuant to Local Civil Rule 5.1(c)(1), Plaintiffs' residential addresses are being filed under seal with the Court in a separate Notice of Filing.

# COMPLAINT

## I. INTRODUCTION

1. Plaintiffs are former Special Agents, Staff Operations Specialists ("SOSs"), and Intelligence Analysts ("Analysts") of the Federal Bureau of Investigation ("FBI" or the "Bureau") who were assigned to investigate Donald Trump's[2] unlawful retention of classified documents following his first term as President of the United States—an investigation that later became known as "Plasmic Echo" and is often referred to as the "classified documents case." Plaintiffs did not volunteer to participate in Plasmic Echo; they were assigned to the case because they were members of specific FBI Counterintelligence and Intelligence squads. The case team was composed of the Bureau's leading experts in investigating espionage, mishandling of classified documents, media leaks, and other crimes implicating national security.

2. Combined, Plaintiffs represent over a century of experience and service to the FBI. Plaintiffs were involved in numerous high-profile investigations to thwart threats and respond to crises and attacks against the United States, including the Boston Marathon bombing; the assassination attempt against President Trump in Butler, Pennsylvania; the recovery of multiple American citizens held abroad; the interdiction of Iranian-made munitions intended for the Houthis; and numerous leaks of national security or defense information to foreign countries and designated foreign terrorist organizations. Through their investigative work, Plaintiffs uncovered and disrupted myriad attempts by the United States' adversaries to degrade our national security. The broader U.S. Intelligence Community ("IC"), senior government leaders, and international

[2] In instances where Donald Trump's actions occurred in his capacity as a private citizen before retaking office for his second term as President of the United States, this Complaint refers to him as "Trump." In instances where Trump's actions occurred while he held office as President in either his first or second terms, this Complaint refers to him as "President Trump."

liaison partners repeatedly relied on Plaintiffs to share operational information and to safeguard American lives and interests.

3. Plaintiffs worked on the Plasmic Echo investigation with the same rigor as they had for all of their assignments with the FBI. They performed their duties apolitically, in accordance with the FBI's policies and procedures, and with the utmost professionalism, diligence, and care.

4. As the Plasmic Echo investigation revealed, when Trump left office at the conclusion of his first term after losing the 2020 presidential election, he caused dozens of boxes containing "Top Secret," "Secret," and "Confidential" materials to be moved from the White House to The Mar-a-Lago Club ("Mar-a-Lago"), a social club located in Palm Beach, Florida, which Trump owned and maintained as his primary residence.[3] While the classified documents were in his possession, Trump improperly stored, traveled with, and revealed the documents to individuals who had neither the need to know nor the security clearance required to access them. Mar-a-Lago also hosted events for tens of thousands of members and guests during the time frame the documents were in Trump's possession.

5. The U.S. National Archives and Records Administration ("NARA"), a federal agency responsible for archiving presidential records, requested numerous times that Trump return the materials. Separately, the U.S. Department of Justice ("DOJ") and FBI served legal process on Trump and his companies to secure the return of the materials. Despite these efforts, Trump failed to return all of the classified documents he retained after leaving office. To the contrary,

[3] Plaintiffs note that, on February 23, 2026, the U.S. District Court for the Southern District of Florida issued an Order in *United States v. Trump et al.* that prevents Plaintiffs from "releasing, distributing, conveying, or sharing with anyone outside the Department of Justice any information or conclusions" contained in the Special Counsel's report ("Volume II") "or in drafts thereof," which details much of Plaintiffs' work on Plasmic Echo. Order on Unopposed Motions Seeking Prohibition on Release of Volume II, *United States v. Trump, et al.*, No. 23-cr-80101 (AMC) (S.D. Fl. Feb. 23, 2026) (ECF 779), at 14–15, ¶ 3 ("Order Prohibiting Volume II Release"). Thus, the description of Plasmic Echo set forth herein is limited strictly to what is in the public record. Should a need arise later to discuss any non-public information contained in Volume II, Plaintiffs will seek appropriate guidance or relief from the Court.

Trump obstructed DOJ's and FBI's attempts to recover the documents, while continuing to improperly store them and risk unauthorized access by additional third parties.

6. After DOJ presented the evidence that the FBI gathered in connection with Plasmic Echo—including pursuant to a court-authorized search warrant executed at Mar-a-Lago on August 8, 2022— to a federal grand jury, the grand jury returned an initial 38-count indictment, followed by a 42-count superseding indictment, against Trump and two of his employees. *See* Superseding Indictment, *United States v. Donald J. Trump*, No. 23-cr-80101 (S.D. Fla. July 27, 2023) (ECF 85) (the "Indictment").[4]

7. After returning to office for his second term in January 2025, President Trump and top government officials made clear in numerous public statements that they intended to exact revenge against anyone Trump deemed to have wronged him. President Trump's targets included former officials in his first administration, perceived political opponents, and career federal employees—such as Plaintiffs—whose only offense was performing their assigned jobs faithfully.[5]

8. Indeed, any FBI employee associated with the court-authorized search of Mar-a-Lago was doomed after President Trump's second inauguration. On information and belief, then-Acting Deputy Attorney General Emil Bove demanded that interim FBI leadership take "symmetrical action" at the FBI to mirror what had been occurring at the DOJ in the weeks

---

[4] A federal district court later dismissed the Indictment on the ground that the DOJ Special Counsel who oversaw Plasmic Echo had not been properly appointed, without reaching the merits of the underlying allegations. While the DOJ initially sought to appeal the district court's dismissal of the Indictment, the DOJ withdrew its appeal shortly after Trump won the 2024 presidential election due to the Department's long-standing policy not to prosecute sitting Presidents. *See* Eric Tucker, *Justice Department drops criminal proceedings against Trump co-defendants in classified records case*, AP (Jan. 29, 2025), https://apnews.com/article/trump-justice-department-classified-documents-c887926663beeb5a04d45c7c896609ba.

[5] *See, e.g.*, Peter Charalambous *et al.*, *Here's a List of the Individuals, Including James Comey, Targeted by the Trump Administration*, ABC News (July 10, 2026), https://abcnews.com/US/list-individuals-including-lisa-cook-targeted-trump-administration/story?id=124968309.

following President Trump's second inauguration: summary firings of individuals associated with investigations into Trump. Citing pressure from White House Deputy Chief of Staff Stephen Miller, Bove specifically demanded that the FBI turn over the names of those individuals who participated in the search of Mar-a-Lago so they could be terminated, a demand that the acting FBI leadership refused.

9. Over the course of two days in February 2026, Defendant Patel, who was by then serving as the Director of the FBI, summarily fired each of the Plaintiffs. Plaintiffs were unlawfully terminated not for any cause or any legitimate reason, but only to satisfy the President's personal vendetta. The firings did not follow any internal investigation or disciplinary process within the FBI, and Plaintiffs were not given any notice, a hearing, or an opportunity to appeal. Instead, Patel claimed to rely solely upon "Article II" to support the firings.

10. An "Article II" firing is an invention of the current Administration. Its invocation represents an attempt to convert all federal employees into political appointees and condition their continued employment on their (perceived) personal and political loyalty to President Trump. In reality, the "Article II" rationale is nothing more than a pretext for firings—like those of the Plaintiffs—that are politically retributive and unlawful.

11. Before and after Plaintiffs' firings, President Trump, Defendant Patel, Defendant Blanche, and others in Trump's orbit publicly impugned Plaintiffs' integrity, despite their unimpeachable service records; smeared their work as politically motivated, when it was not; and made clear that their fate was sealed by virtue of simply having worked on an investigation into Trump's wrongdoing. For example, a month after Plaintiffs' unlawful firings, Blanche stated that the Administration had "cleaned house" at the FBI by firing anyone associated with investigations

relating to Trump, and that there "isn't a single man or woman with a gun, federal agent, still in that organization that had anything to do with the prosecution of President Trump."[6]

12. Prior to their firings, Plaintiffs were involved in ongoing and sensitive counterintelligence and counterterrorism investigations in connection with threats emanating from countries across the globe. As a result of their unlawful and hasty firings, Plaintiffs' investigations were not properly transferred to other FBI Special Agents or Analysts. The impact of these heedless actions on America's national security is immeasurable.

13. Defendants' actions violated Plaintiffs' First Amendment rights to free association and speech and their Fifth Amendment right to due process. In the case of Plaintiffs Jennifer Bacon and Jeremy Linton, Defendants' actions also constitute a violation of the Separation of Powers. Plaintiffs seek equitable relief to vindicate their constitutional rights and declaratory relief pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

## II. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the Constitution and laws of the United States. The Court has authority to issue declaratory and equitable relief, including reinstatement of Plaintiffs to their employment with the FBI, pursuant to 28 U.S.C. § 2201, and the Court's inherent equitable powers.

12. Venue is appropriate in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (e).

[6] Ryan J. Reilly, *Ex-FBI agents on Trump cases cite Todd Blanche's remarks in suit over 'illegal' firing*, NBC News (Mar. 31, 2026), https://www.nbcnews.com/politics/justice-department/ex-fbi-agents-trump-cases-cite-todd-blanches-remarks-suit-illegal-firi-rcna266039.

## III. PARTIES

### *Plaintiffs*

13. **Plaintiff Jennifer Bacon** devoted over 25 years to serving and protecting the United States, first as an officer in the United States Air Force and later as a national security leader in the FBI, until she was fired unlawfully on February 25, 2026. During her military service, Bacon received the Meritorious Service Medal, four Air Force Commendation Medals, and the Joint Service Achievement Medal.

14. Bacon earned her undergraduate degree in Political Science from the University of Iowa in 1996 and a Master of Arts in Organizational Leadership and Learning from the George Washington University in 2022.

15. In 2010, after nine years of active-duty military service, Bacon joined the FBI as a Special Agent and was assigned to the Washington Field Office ("WFO"), where she worked on counterintelligence and global espionage cases.

16. In 2014, Bacon transferred to the Phoenix Field Office, where she was certified in the counterintelligence career field, as a Physical Fitness Advisor, and FBI Crisis Management Coordinator. In 2016, Bacon was promoted to Supervisory Special Agent ("SSA") and later to Unit Chief in the Counterespionage Section of the FBI Headquarters Counterintelligence Division, in Washington, D.C.

17. In 2019, Bacon returned to WFO where she served as a Field-Supervisory Special Agent and Crisis Management Team Leader until 2023.

18. In 2023, Bacon was promoted to serve as the Counterterrorism, Surveillance and Crisis Response Assistant Special Agent in Charge ("ASAC") at the Baltimore Field Office, leading more than 100 FBI employees in Maryland and Delaware. As ASAC, Bacon managed the

FBI's response to the 2024 collapse of the Francis Scott Key Bridge and assisted the FBI's Pittsburgh Division with its response to the assassination attempt on Trump in Butler, Pennsylvania.

19. In 2025, Bacon was promoted to Section Chief in the Counterintelligence Division.

20. Throughout her tenure at the FBI, Bacon directed thousands of investigations relating to the mishandling of classified information, espionage, insider threats, media leaks, transnational organized crime, murder for hire, and material support to designated foreign terrorist organizations.

21. In addition to her casework, Bacon was a valued leader within the FBI and the broader U.S. Intelligence Community. In July 2024, Bacon was selected by the Director of the FBI's Human Resources Division[7] to serve as a voting member of the FBI's Disciplinary Review Board. From January 2025 to September 2025, Bacon led the FBI's National Counterintelligence Task Force and the Counterintelligence Training Center in Quantico, Virginia. Bacon routinely briefed FBI and other federal, state, and local law enforcement leaders; Congressional staff and members; and foreign partners on emerging threats and investigations.

22. In January 2025, Bacon became a member of the FBI's Senior Executive Service ("SES"). One year later, she was notified that her probationary period had ended and she became a career appointee.

23. In July 2025, Bacon attended a National Security Symposium in Sydney, Australia, where she briefed Australian law enforcement and national security leaders on several topics at the FBI Counterintelligence Division leadership's request. Director Patel and his Chief of Staff were present at Bacon's briefing, after which Director Patel shook her hand and thanked her for

---

[7] The FBI's Human Resources Division is now known as the Human Capital Branch.

her excellent work. Approximately one week later, the Director's Chief of Staff thanked Bacon again and relayed Director Patel's comment that her presentation was one of the best briefings he received during his trip to Australia. Based on her performance in Australia, Bacon was selected by the FBI to give another briefing at an International Security Conference in Seoul, South Korea.

24. During her FBI career, Bacon was awarded the FBI Medal of Excellence, the Attorney General's Award for Outstanding Counterintelligence Investigation, two awards from the Director of National Intelligence, and the FBI Director's Leadership Award.

25. **Plaintiff Zach Feldman** served as a Special Agent from June 2021 until Defendants fired him unlawfully on February 25, 2026.

26. In 2016, Feldman earned a bachelor's degree in mechanical engineering from The Ohio State University. Before joining the FBI, Feldman worked as a mechanical engineer for a consumer robotics company.

27. In June 2021, Feldman entered the FBI Academy in Quantico, Virginia. While at the Academy, Feldman received the Top Shot award for the highest overall scores in firearms qualifications in his class.

28. In November 2021, Feldman entered on duty as a Special Agent with WFO's Counterintelligence Division. Among other assignments, WFO's Counterintelligence Division handles high-profile espionage, insider threats, and transnational repression cases. As a Special Agent, Feldman worked on some of the country's most sensitive and complex counterintelligence and counterespionage investigations, including cases involving mishandling of national defense information and insider threats. Feldman also supported many investigations involving health care fraud, public corruption, narcotics, and domestic terrorism. Feldman deployed on nearly a dozen temporary duty assignments in the U.S. and overseas in support of counterintelligence and

counterterrorism investigations and operations.

29. In August 2024, Feldman was selected to join WFO's Tactical Operations Center ("TOC"). The TOC serves as the command post for complex law enforcement operations—managing real-time information, communications, and logistics. It coordinates tactical teams, negotiators, medical personnel, aviation assets, and command staff to ensure situational awareness and effective decision-making throughout the mission. In August 2025, Feldman completed the Special Weapons and Tactics ("SWAT") Tactical Operations Center certification course.

30. In January 2025, Feldman was selected through a competitive process to join a specialized surveillance group that provides high risk surveillance and tactical response capabilities to cases involving threats to life, child endangerment, organized crime, and terrorism. Feldman successfully completed training courses in several disciplines, including surveillance, tactics, advanced driving, and photography.

31. In June 2025, in addition to his other duties, Feldman completed training and a certification course to become a digital evidence exploitation technician ("DEXT").

32. Feldman spent three years gaining valuable tactical and investigative experience and training in order to compete for a position on WFO's SWAT team—a primary goal of his since joining the FBI. Feldman was unlawfully fired just six weeks before he would have had the opportunity to compete for this position.

33. Throughout his career at the FBI, Feldman was recognized repeatedly for his exceptional performance as a Special Agent. In August 2023, Feldman received an award for his outstanding work on a national security investigation. In June 2024, Feldman was recognized for leading a counterespionage investigation involving the removal and transmission of national

defense information to a foreign intelligence service.

34. **Plaintiff Gilbert Granados** spent more than a decade with the FBI before Defendants fired him unlawfully on February 25, 2026.

35. Granados began his service with the FBI as an intern while completing his undergraduate studies, where he supported WFO's Counterintelligence Division and gained early exposure to the FBI's counterespionage and media leaks mission. In 2013, Granados graduated from Salisbury University with a bachelor's degree in Conflict Analysis and Dispute Resolution and Psychology. In 2018, Granados graduated from Utica University with a Master of Science in Cybersecurity.

36. In 2014, Granados joined the FBI as an SOS and served in the FBI's Counterterrorism Division where he supported sensitive FBI investigations, including the FBI's investigative and intelligence response to the 2016 Brussels terrorist attacks carried out by the Islamic State of Iraq and al-Sham ("ISIS").

37. In 2018, Granados joined the FBI's Counterintelligence Division where he provided tactical support to several high-profile and sensitive counterespionage investigations, including the mishandling of information and media leaks. Like many of his colleagues, Granados's work regularly involved matters concerning Iranian counterintelligence and espionage. Through these assignments, Granados developed substantial experience supporting complex counterespionage investigations. Consequently, he was frequently requested by both Counterintelligence Division leadership and the field to support FBI field offices in furtherance of their cases.

38. After Granados's duties relating to Plasmic Echo concluded in mid-2023, he returned to the FBI's Counterintelligence Division. In early 2025, based on Granados's

counterintelligence experience and the operational needs of the FBI, he was reassigned to support internal espionage matters, providing his depth of knowledge and organizational prowess to this mission set.

39. Throughout his career at the FBI, Granados earned either an "Excellent" and/or "Exemplary Performer" rating in each of his performance evaluations. Granados also received numerous awards based upon his exemplary service, including the Department of Energy Boris Pash Award for Counterintelligence Excellence, the FBI Medal of Excellence, and the Director of National Intelligence Counterintelligence Investigation and Counterintelligence Operations Awards.

40. **Plaintiff Catherine Herrera** served as a Supervisory Intelligence Analyst at the FBI until Defendants fired her unlawfully on February 25, 2026.

41. In 2007, Herrera graduated from Georgetown University with a bachelor's degree in Spanish. Prior to joining the FBI, Herrera worked as a bilingual procurement analyst at the Pan American Health Organization and as an assistant at the Center on Global Counterterrorism Cooperation.

42. In 2009, Herrera joined the FBI as an Intelligence Analyst and was assigned to the National Gang Intelligence Center ("NGIC") in Crystal City, Virginia. As an Intelligence Analyst with the NGIC, Herrera reviewed FBI field reports and worked with state and local law enforcement to identify and assess the capabilities of violent prison gangs. Herrera became an expert on these gangs' tactics, associations, and sources of narcotics and other illicit materials.

43. In 2012, Herrera moved to WFO and was assigned to a counterintelligence team focused on identifying and counteracting intelligence threats from Iran and the Middle East.

44. In 2013, Herrera was assigned to a counterintelligence team focused on Russia.

Herrera became one of the FBI's foremost experts on Russian intelligence capabilities.

45. In 2017, Herrera moved from WFO back to FBI Headquarters, where she joined a counterintelligence team that was similarly focused on Russia. Among other assignments, Herrera was part of a data exploitation team that investigated Russia's compromise of U.S. State Department emails. While Herrera was serving as an intelligence analyst, she was regularly trusted with high profile and consequential assignments, including assessing evidence of election interference by foreign entities.

46. In 2018, the FBI promoted Herrera to supervise a team of analysts focused on Iran counterintelligence. After Iranian general Qasem Soleimani's death, Herrera's team helped lead the FBI's effort to identify and neutralize potential retaliatory attacks by Iran against the United States. In that role, Herrera worked with the Secret Service to uncover and prevent assassination attempts against President Trump.

47. In late 2022, Herrera returned to WFO to serve as the supervisor of the Intelligence squad. By the time that then-Attorney General Merrick Garland appointed Special Counsel Jack Smith to oversee the Plasmic Echo investigation in November 2022, Herrera and approximately half of the Intelligence squad had been assigned to support the Special Counsel's Office full-time. By mid-2024, the members of Herrera's team had largely wound down their work on Plasmic Echo and returned to working on counterespionage cases.

48. In February 2025, Herrera was selected to serve as a supervisor at the FBI's Threat Screening Center ("TSC") in Northern Virginia. At the TSC, Herrera oversaw the expansion of intelligence production to detect and disrupt threats from foreign terrorists and Transnational Criminal Organizations ("TCOs"). Herrera served at the TSC until Defendants unlawfully

terminated her.

49. During her career at the FBI, Herrera earned "Outstanding" and/or "Exemplary Performance" performance evaluation ratings. She also received two FBI Medals of Excellence for exemplary leadership on sensitive investigations, the Intelligence Community National Counterintelligence and Security Professional Award, and multiple accolades for her work at the TSC.

50. **Plaintiff Harrison Kaufman** served as an FBI SOS at the time Defendants fired him unlawfully on February 25, 2026.

51. In 2019, Kaufman earned a Bachelor of Science in biochemistry and a Bachelor of Science in national security studies, with minors in Arabic, global studies - Urdu, and chemistry. During his undergraduate studies, Kaufman began his service with the FBI as an intern at the FBI's New York Field Office, New Haven Field Office, and Laboratory Division. While employed with the FBI, Kaufman began pursuing a law degree and enrolled in the Antonin Scalia Law School at George Mason University.

52. In June 2019, after graduating from college, Kaufman joined the FBI as an Operational Support Technician ("OST") at WFO. While serving as an OST, Kaufman also obtained his Emergency Medical Technician ("EMT") certification.

53. In December 2021, Kaufman was hired by the FBI as an SOS. In February 2022, after graduating from the FBI Academy, Kaufman began in his new role at WFO on the Intelligence squad. A few days into this new role, Kaufman was assigned to Plasmic Echo.

54. In addition to his intelligence analysis duties, Kaufman performed other functions in furtherance of the FBI's mission. For example, in approximately November 2019, Kaufman joined the WFO Hazardous Evidence Response Team ("HERT"), where he was trained in forensic

evidence collection techniques and managing crime scene processing. In early 2020, Kaufman was certified to collect chemical, biological, radiological, and nuclear evidence from FBI-managed crime scenes. In approximately September 2020, Kaufman began serving as a WFO operational medicine EMT providing emergency medical support and training to FBI personnel. In approximately May 2020, Kaufman was selected to serve as a member of WFO's Professional Staff Advisory Committee ("PSAC"). PSAC is an advisory group that collaborates with WFO executive management to identify, assess, and address issues affecting the office's professional staff.

55. As an evidence response team member, Kaufman responded to some of the FBI's most sensitive, high-profile, and complex crime scenes, including the recovery efforts at the crash site of Flight 5342 at Ronald Reagan National Airport, the execution of search warrants in connection with an investigation into an individual who was convicted of mailing letters containing ricin to President Trump,[8] and the investigation of pipe bombs that were placed in January 2021 near the headquarters of the Democratic and Republican National Committees. In the pipe bomb case, the FBI's work led to the identification and arrest of a suspect, after which Director Patel held a press conference and praised Kaufman's team for their "great resolve" on a case of "massive public importance."[9] Director Patel personally shook Kaufman's hand and thanked him for his work before the arrest and search warrants were executed.

56. After Kaufman's duties relating to Plasmic Echo concluded in mid-2024, he continued to work on counterintelligence cases. In October 2024, Kaufman transferred to a

---

[8] Press Release, Dep't of Justice, Foreign National Sentenced to Over 21 Years for Mailing Ricin to President of the United States in 2020 (Aug. 17, 2023), https://www.justice.gov/archives/opa/pr/foreign-national-sentenced-over-21-years-mailing-ricin-president-united-states-2020.
[9] C-SPAN, Facebook (Dec. 4, 2025), https://www.facebook.com/CSPAN/videos/the-fbi-on-thursday-arrested-a-suspect-believed-to-have-planted-pipe-bombs-outsi/1127052279506600/.

counterterrorism squad at the Bureau's Northern Virginia Resident Agency ("NVRA") focusing on combating terrorism in the Middle East and threats emanating from Iran and its proxies. Specifically, Kaufman worked on investigations related to hostage-takings and kidnappings of United States citizens abroad.

57. During his time at the FBI, Kaufman received numerous awards related to his intelligence work, deployments to national security special events and crime scenes, and work with the WFO PSAC. In the months leading up to Kaufman's unlawful termination, during his monthly meetings with the Assistant Director in Charge ("ADIC") of WFO, Darren Cox, Kaufman consistently received positive feedback on his performance and dedication to WFO and the FBI.

58. **Plaintiff Jeremy Linton** served for nearly a decade at the FBI, from May 2016 until Defendants fired him unlawfully on February 25, 2026.

59. Prior to joining the FBI, Linton served for seven years as an Information Warfare Officer in the United States Navy. While in the Navy, Linton was deployed overseas and was frequently assigned to support National Security Agency ("NSA") operations. During his military service, Linton received the Joint Service Commendation Medal and the Navy Commendation Medal. Linton earned his undergraduate degree in Information Science from Christopher Newport University and his graduate degree in Information Assurance from Johns Hopkins University.

60. In May 2016, Linton entered the FBI Academy. After completing his training, Linton was assigned to the Counterintelligence Division at WFO.

61. In March 2019, Linton joined the WFO Crisis Negotiation Team. In February 2020, he became a certified FBI crisis negotiator, eventually rising to serve as a Team Lead for several crisis negotiation teams. Linton used his extensive experience in crisis negotiation to train numerous federal, state, local, and foreign law enforcement officers on effective tactics to de-

escalate difficult situations.

62. As a crisis negotiator, Linton responded to some of the FBI's most sensitive and high-profile crisis situations. For example, in October 2022, Linton responded to an hours-long barricade wherein an armed individual refused to release his minor child and would not comply with police commands. Linton's negotiation successfully resulted in the child's safe release and the individual's peaceful surrender.

63. As another example, in March 2025, Linton served as a crisis negotiator for an operation resulting in the arrest of an MS-13 gang leader in Virginia. After the arrest, Director Patel shook Linton's hand, posed for a photograph with Linton and the operational team, and later sent Linton a signed copy of the photograph as a memento.

64. In September 2025, in recognition of his exceptional performance over nearly a decade of service with the FBI, Linton was promoted to SSA. From then on, Linton's work focused exclusively on Iranian counterintelligence investigations.

65. At the time of his unlawful firing in February 2026, the FBI had arranged for Linton to attend an Advanced Barricades Course to continue to refine his crisis negotiation skills. He did not get the opportunity to attend because of his termination. At the time, Linton was responsible for several dozen counterintelligence investigations relating to threats emanating from Iran. Due to the sudden and unexpected nature of Linton's firing, Linton was unable to transition his cases and impending operations to other agents or convey intelligence that he had received relating to Iran.

66. During his career at the FBI, Linton was awarded the FBI Medal of Excellence, DOJ's 2025 Public Service Award, and numerous other awards for his work.

67. **Plaintiff Erin Matanic** was serving as an SOS at the FBI's NVRA working on

counterterrorism investigations when Defendants fired her unlawfully on February 25, 2026.

68. In 2014, Matanic received a Bachelor of Arts in international studies from the University of Richmond. Before joining the FBI, Matanic worked as a Management and Program Analyst for The Rehancement Group, which provides qualified and experienced personnel to the federal government and commercial clients.

69. In 2017, after graduating from the FBI Academy, Matanic began working at FBI Headquarters as an SOS. Matanic led coordination with the Director's Daily Briefing team to ensure timely delivery of counterintelligence products and helped draft policies to safeguard highly sensitive intelligence. Later, Matanic transitioned to counterespionage investigations, focusing on China and Russia, including cases where Americans attempted to steal classified information, trade secrets, proprietary economic information, or critical technologies for transmission to Russia or China.

70. In 2020, Matanic moved to WFO where she joined the Intelligence squad. In 2022, Matanic was assigned to work part-time on Plasmic Echo. In September 2023, Matanic assigned her Plasmic Echo responsibilities to another analyst when Matanic deployed overseas as an analyst in support of Operation Inherent Resolve, which was the Department of Defense's ("DOD") coalitional mission to defeat the terrorist group ISIS. In early 2024, Matanic's work on Plasmic Echo ended.

71. At that time, Matanic moved to a position on a counterterrorism squad at the NVRA. In this role, Matanic focused on protecting American interests from terrorism threats in and emanating from the Arabian Peninsula and the Balkans.

72. While assigned to the counterterrorism squad, Matanic was the lead analyst for *United States v. Pahlawan*, 3:24-cr-00041-DJN (E.D. Va.). The investigation and prosecution

resulted in a 40-year sentence for Pahlawan—a weapons smuggler with ties to Iran's Islamic Revolutionary Guard Corps.[10] Pahlawan was interdicted while transporting Iranian-made advanced conventional weapons from Iran to various recipients, including the Houthi rebel forces in Yemen. The interdiction operation resulted in the deaths of two Navy SEALs. Matanic's analysis was crucial to developing the case against Pahlawan. In October 2026, the prosecution team received the U.S. Attorney's Office for the Eastern District of Virginia's Public Service Award and the Executive Office for United States Attorneys Director's Award for Superior Performance. Despite being the primary analyst on the case, Matanic's name was not included on the award.

73. In December 2024, the FBI deployed Matanic to Kosovo for 30 days following the bombing of the Ibër-Lepenc water canal, to serve as the FBI's sole FBI intelligence professional on the scene. Matanic advised and supported the Kosovo government's investigation into the attack on its critical infrastructure.

74. In addition to Matanic's intelligence analysis duties, she performed other functions at the FBI. For example, in 2021, Matanic joined WFO's HERT, where she was trained to conduct forensic evidence collection techniques and manage crime scene processing. In 2024, Matanic was certified to collect chemical, biological, radiological, and nuclear evidence in FBI-managed crime scenes.

75. During Matanic's tenure at the FBI, she received the Award for Dedicated Service in 2019, which is awarded to only one SOS across the entire FBI each year, the Joint Civilian Service Achievement and Global War on Terrorism Medals from DOD in 2024 based on her

[10] Press Release, Dep't of Justice, Pakistani National Sentenced to 40 Years for Transporting Iranian-Made Advanced Conventional Weapons (Oct. 23, 2025), https://www.justice.gov/usao-edva/pr/pakistani-national-sentenced-40-years-transporting-iranian-made-advanced-conventional.

deployment combating ISIS, and numerous other awards.

76. **Plaintiff Danielle Ray** spent 20 years in public service protecting the United States from national security threats—including 16 years as an FBI Special Agent—until Defendants unlawfully terminated her on February 26, 2026.

77. In 2006, Ray earned a Master of Science in information systems and joined the NSA, where she conducted computer-systems research in support of NSA's information assurance mission.

78. In 2009, Ray joined the FBI and was assigned to WFO. In 2012, Ray was competitively selected for a position on the Counterterrorism Division's elite Fly Team, where she received specialized training in counterterrorism, overseas operations, evidence collection, interview and interrogation, source handling, technical exploitation, forensic biometrics, firearms, close-quarters combat tactics, wilderness survival, and operational medicine. Ray participated in 28 official overseas deployments to 19 countries in response to high-profile and sensitive incidents that required Ray to put her life in danger in service of American interests.

79. In 2013, Ray responded to the Boston Marathon bombing, where she was on scene for evidence response immediately following the arrest of Dzokhar Tsarnaev. Ray interviewed victims in the hospital and collected CCTV and other evidence that supported Tsarnaev's prosecution. Tsarnaev was ultimately charged with capital offenses and convicted at trial.

80. In Kampala, Uganda, Ray served as the FBI's in-country representative for the Legal Attaché Office. In this role, Ray and others from the U.S. Embassy and local law enforcement raided an enemy compound in Uganda to rescue an American who was being held hostage. Later, while still stationed in Uganda, Ray responded to the Westgate Mall terrorist attack in Nairobi, Kenya. She deployed immediately to Kenya and was part of the initial entry team that

cleared the mall of the remaining active shooter and explosive threats and searched for survivors.

81. In 2016, while detailed as the senior FBI representative to a joint military special operations task force in Iraq, Ray supported an operation that recovered an American who had been surrounded by hostile forces in Mosul.

82. That same year, Ray was promoted to SSA on the Fly Team. In that role, Ray led a team of Special Agents and Intelligence Analysts both on deployments and during mission readiness cycles.

83. In 2018, Ray transferred to WFO to work on global counterespionage matters. She served as the principal relief supervisor for the Counterintelligence Division squad where she was frequently relied on to lead mission planning and investigative strategy. Leveraging her specialized training and experience in dynamic and austere environments, Ray directly contributed to the successful execution of complex operations domestically and abroad. Ray also held specific expertise in matters relating to Iranian threats to U.S. national security and was one of few employees in the U.S. Intelligence Community trained to handle, control, and transport the nation's most gravely sensitive information.

84. In recognition of Ray's exceptional service and repeated displays of courage, Ray was honored with multiple awards during her FBI career, including the Attorney General's Award for Distinguished Service, two FBI Medals of Excellence, the Director of National Intelligence Counterintelligence Investigation Award and Counterintelligence Operations Award, and numerous other honors from the FBI, DOJ, DOD, NSA, and Central Intelligence Agency ("CIA").

85. **Plaintiff Rachel Vaccaro** is a former Intelligence Analyst who spent over 21 years in public service protecting the United States from national security threats until the Defendants

unlawfully terminated her on February 25, 2026.

86. In 2004, Vaccaro earned a bachelor's degree in business administration from Mary Washington College. In 2005, Vaccaro joined the FBI. In 2010, Vaccaro earned a master's degree in forensic psychology from Marymount University.

87. During the course of her distinguished tenure with the FBI, Vaccaro worked and served as the lead analyst on hundreds of investigations relating to the mishandling of classified information, espionage, insider threats, and media leaks. Her work directly contributed to the convictions of many of the spies and media leakers caught and arrested by the FBI during the past two decades.

88. In recognition of her exceptional service and dedication to the FBI's national security mission, Vaccaro received the Director's Award and was nominated for several Attorney General awards, and received various other prestigious honors from the FBI, DOJ, and other Intelligence Community agencies. She was also selected to deploy to the United Kingdom and Germany on behalf of the FBI.

89. In early 2022, Vaccaro's Intelligence Division squad was assigned to Plasmic Echo. Vaccaro's work on this investigation ended in mid-2024.

90. After the investigation, Vaccaro continued to be recognized for her outstanding work. In 2025 alone, Vaccaro received four awards, including two that were signed by Director Patel highlighting her exceptional leadership in analysis and collaboration. During Vaccaro's performance review in November 2025, she received an "Exemplary" performance rating. Three months later, Defendants summarily terminated her.

***Defendants***

91. **Defendant Kashyap Patel** is sued in his official capacity as the Director of the

FBI. In that capacity, Patel maintains an office in Washington, D.C. He has been employed by the FBI for approximately 20 months as of the date of this filing.

92. **Defendant Federal Bureau of Investigation** is a subordinate component of the DOJ pursuant to 28 C.F.R. § 0.1. The FBI's principal offices are in Washington, D.C.

93. **Defendant Todd Blanche** is sued in his official capacity as the Attorney General of the United States. He is the head of the Department of Justice and maintains an office in Washington, D.C. At the time of Plaintiffs' firings, Pamela Bondi was the Attorney General of the United States and Blanche was the Deputy Attorney General. On April 2, 2026, President Trump announced on Truth Social that he was removing Bondi from her position as Attorney General. Blanche assumed the role of Acting Attorney General until the United States Senate confirmed him as Attorney General on August 8, 2026.

94. **Defendant Department of Justice** is headquartered in Washington, D.C. and is an agency of the United States subject to the jurisdiction of this Court. DOJ controls its components, including the FBI.

## IV. FACTS

### A. WFO Counterintelligence and Intelligence Division Squads

95. Until Defendants unlawfully terminated them, Plaintiffs were Special Agents and Analysts assigned to various counterespionage and counterintelligence efforts across the FBI. At the time they were assigned to Plasmic Echo, they were members of Counterintelligence and Intelligence Division squads at WFO. Those squads focus on investigations relating to threats emanating from countries outside of Russia and China (which are managed by separate squads), or where the foreign nexus is initially ambiguous. The squads are responsible for some of the Bureau's most sensitive investigations and operations involving espionage and the unauthorized

disclosure, unlawful retention, or mishandling of classified information.

96. In general, within these squads, Special Agents conduct investigations, develop and operate confidential human sources, interview witnesses, and work with federal prosecutors to obtain and execute legal process. Analysts evaluate intelligence, analyze developments in the context of broader foreign intelligence threats, identify remaining intelligence gaps, and help determine an investigation's next steps. In addition to conducting analysis on individual cases, some Analysts produce strategic assessments that are disseminated to various government stakeholders, ranging from Special Agents operating in the field to senior FBI leaders, Cabinet officials, and the President. As members of these WFO Counterintelligence and Intelligence Division squads, Plaintiffs worked together on numerous national security matters of exceptional consequence.

### B. Plaintiffs Are Assigned to Investigate Trump's Unlawful Retention and Mishandling of Classified Documents

97. President Trump first entered office on January 20, 2017. *See* Indictment ¶ 1. Over the course of his first term, President Trump collected "newspapers, press clippings, letters, notes, cards, photographs, official documents, and other materials in cardboard boxes that he kept in the White House." *Id.* ¶ 2.

98. By virtue of the office he held, President Trump had access to the United States' most sensitive classified documents and national defense information. President Trump stored hundreds of documents with varying levels of classification that he obtained during his presidency in his cardboard boxes at the White House. *Id.*

99. On January 20, 2021, after having lost the 2020 presidential election to Joseph R. Biden, Jr., Trump ceased to occupy the office of President of the United States and became a private citizen. *Id.* ¶ 4. Thereafter, Trump was no longer authorized to possess or retain classified

material. *Id.* ¶¶ 4, 18.

100. When Trump departed the White House at the end of his first term, however, he caused dozens of his cardboard boxes to be transported to Mar-a-Lago. *Id.* ¶¶ 4, 25. Trump was not authorized to store, possess, review, display, or discuss classified documents at Mar-a-Lago. *Id.* ¶ 5. At the time, Mar-a-Lago was accessible to thousands of members of the public, had hundreds of members, and was staffed by more than 150 employees. *Id.* ¶¶ 11–12. Between January 2021 and August 2022, Mar-a-Lago hosted events that cumulatively drew tens of thousands of public guests. *Id.* ¶ 12.

101. Beginning in May 2021, NARA repeatedly requested that Trump turn over presidential records that NARA suspected Trump had unlawfully brought with him to Mar-a-Lago after his presidency concluded. *Id.* ¶ 38. NARA made these demands in connection with its powers and responsibilities pursuant to the Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201–2209. *See Trump v. United States*, 54 F.4th 689, 694 (11th Cir. 2022). NARA warned Trump on multiple occasions that if he did not turn over the presidential records in his possession, NARA would refer the matter to the DOJ. Indictment ¶ 38.

102. Trump understood—as reflected in statements that he made prior to assuming the presidency and during his first term in office—that protecting classified information was vital to ensuring the country's national security. *Id.* ¶¶ 23–24. Trump opined that individuals who caused classified information to be disclosed "should be ashamed of themselves. Really ashamed." *Id.* ¶ 37.

103. Nevertheless, in or around the spring and summer of 2021, Trump continued to store classified documents in various unsecure locations at Mar-a-Lago, *id.* ¶ 5; traveled with classified documents to his residence at Trump National Golf Club in Bedminster, New Jersey,

*see id.* ¶ 33; and disclosed the contents of classified documents to a writer, a publisher, members of his staff, and a representative of his political action committee, none of whom possessed the required security clearance to view the classified material. *Id.* ¶¶ 6, 34–36.

104. In or around January 2022, after months of discussions, two of Trump's employees transferred fifteen cardboard boxes of documents to NARA. *Id.* ¶ 47. NARA reviewed the boxes and discovered that they contained "newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-presidential records, and *a lot of classified records*." *Trump*, 54 F.4th at 694 (emphasis added).

105. In February 2022, NARA submitted a referral to the DOJ advising that NARA had discovered classified documents in Trump's cardboard boxes. *See id.*; Indictment ¶ 50. Following NARA's referral, the FBI assigned Plaintiffs, who were then members of the above-described Counterintelligence and Intelligence squads, to investigate Trump's unlawful retention and mishandling of classified documents. Plaintiffs did not initiate or volunteer to join the investigation, which came to be known as Plasmic Echo.

106. At the direction of the DOJ, the FBI took the preliminary step of opening an "assessment" to determine who had caused the classified documents to be taken to Mar-a-Lago. Because the inquiry was considered a "Sensitive Investigative Matter" ("SIM") due to a former president's potential involvement, Plaintiffs were required to obtain numerous approvals through their chain of command, including from then-Attorney General Merrick Garland and then-FBI Director Christopher Wray, before a full criminal investigation could be opened. Higher levels of approval are standard for SIMs. During the assessment phase, Plaintiffs Bacon, Ray, and Linton attended coordination meetings and calls with DOJ, FBI General Counsel, and National Security Law Branch attorneys, and FBI Counterintelligence Division and WFO leadership. Throughout

the assessment phase, Plaintiffs Ray, Linton, Feldman, and Kaufman conducted authorized assessment investigative steps such as interviews, database checks, and open source queries.[11] Based on the findings from this initial assessment, FBI and DOJ leadership authorized the opening of a full investigation.

107. On or about March 30, 2022, the FBI opened a criminal investigation into Trump's unlawful retention of classified documents. Indictment ¶¶ 7, 51. On or about April 26, 2022, DOJ opened a federal grand jury investigation. *Id.* ¶¶ 7, 52.

108. In or around mid-May 2022, NARA gave the FBI access to the 15 cardboard boxes of documents that Trump had provided to NARA in January 2022. Plaintiffs Bacon, Ray, Feldman, and Kaufman reviewed the boxes at NARA and discovered that they contained 197 classified documents, including 30 documents that were marked "Top Secret." *Id.* ¶¶ 8, 49.

109. In May 2022, after Plaintiffs obtained evidence that Trump had retained additional classified documents at Mar-a-Lago that he had not turned over to NARA, the DOJ issued a grand jury subpoena to The Office of Donald J. Trump for all documents or writings bearing classification markings that were in Trump's or The Office of Donald J. Trump's possession, custody, or control. *Trump*, 54 F.4th at 695; Indictment ¶ 53.

110. On June 3, 2022, after the grand jury subpoena was issued, Plaintiff Ray traveled to Mar-a-Lago, along with other FBI and DOJ personnel, to meet with Trump's attorneys. During this meeting, one of Trump's attorneys produced a Redweld folder containing 38 classified documents that the attorney had collected from other cardboard boxes located in Mar-a-Lago's storage room. Another attorney for Trump provided a certification claiming that "a 'diligent search

[11] Broadly, "open-source" queries involve investigative steps that can be done using commonly available investigative tools without applying for formal legal process.

was conducted' of the boxes moved from the White House" to Mar-a-Lago and that "[a]ny and all responsive documents" had been produced. *Trump*, 54 F.4th at 695; Indictment ¶ 70. Trump joined his attorneys for a portion of the meeting and told the FBI and DOJ personnel, including Plaintiff Ray, that he was "an open book." Indictment ¶ 72.

111. While at Mar-a-Lago, Plaintiff Ray observed that there were surveillance cameras located near Mar-a-Lago's storage room, which was one of the locations where Trump had stored some of the cardboard boxes from the White House. *Id.* ¶¶ 5, 74.

112. On June 24, 2022, following this visit to Mar-a-Lago, the DOJ issued a grand jury subpoena to the Trump Organization seeking "[a]ny and all surveillance records, videos, images, photographs and/or CCTV from internal cameras" from certain locations at Mar-a-Lago, including near its storage room. *See id.* ¶¶ 75, 77.

113. The FBI's investigation subsequently revealed that, after the Trump Organization received this grand jury subpoena, two of Trump's employees—acting at Trump's direction—attempted to delete the CCTV footage to conceal its contents from the grand jury. *See id.* ¶¶ 76, 78–87. They were unsuccessful.

114. Pursuant to the subpoena, in or around July 2022, Plaintiffs Bacon, Ray, Kaufman, and Vaccaro, among other FBI officials, obtained and reviewed the CCTV footage from Mar-a-Lago. *Id.* ¶ 88. The CCTV footage captured Trump's employees' movements in and around Mar-a-Lago's storage room between January 10, 2022, and June 24, 2022. *Id.* ¶¶ 77, 88.

115. Plaintiffs' review of the CCTV footage revealed that, contrary to their representations to the FBI and DOJ, Trump's attorneys had not conducted a search of all of Trump's cardboard boxes that were transported from the White House to Florida, and Trump had likely not turned over all the classified documents in his possession. The footage showed that—

apparently unbeknownst to Trump's attorneys at the time—in the days leading up to the review by one of Trump's attorneys of the cardboard boxes in the storage room, one of Trump's employees had removed approximately 64 cardboard boxes from the storage room and transferred them to Trump's personal residence at Mar-a-Lago. *Id.* ¶ 63. On the day of, but prior to, Trump's attorney's review of the cardboard boxes in the storage room, two of Trump's employees—at Trump's direction—moved only 30 of the 64 boxes back to the storage room. *Id.* Thus, Trump's attorneys never reviewed the other 34 boxes.

116. Following their review of the CCTV footage, certain Plaintiffs, together with DOJ attorneys, drafted a search warrant for which Plaintiff Linton served as the affiant. The DOJ presented Linton's sworn affidavit to a U.S. Magistrate Judge of the U.S. District Court for the Southern District of Florida, who independently determined that probable cause existed to believe that, if the FBI were to search Mar-a-Lago, it would find evidence, contraband, fruits of crime, or other items that were illegally possessed, in violation of 18 U.S.C. §§ 793, 2071, or 1519. *Trump*, 54 F.4th at 695; *see also* Affidavit in Support of an Application Under Rule 41 For a Warrant to Search and Seize ¶ 79, *United States v. Sealed Search Warrant*, No. 22-MJ-08322 (S.D. Fl. Aug. 5, 2022) ("Search Warrant").[12] The Magistrate Judge issued the search warrant authorizing the FBI to search for and seize all documents with classification markings, among other items, at Mar-a-Lago, including in its "offices, storage rooms, and [other] potential storage sites." *Trump*, 54 F.4th at 695; Indictment ¶ 89.

117. On August 8, 2022, Plaintiffs Bacon, Ray, Linton, and other FBI employees executed the search warrant at Mar-a-Lago. Indictment ¶ 89. The FBI seized an additional 102

[12] The Search Warrant is publicly available at https://www.justice.gov/d9/2023-09/08.31.23. -- Mar-a-Lago Search Warrant - Interim.pdf.

documents that were marked "Top Secret," "Secret," or "Confidential" from Mar-a-Lago's storage room and Trump's personal office, including classified material that was recovered from inside Trump's desk. *Trump*, 54 F.4th at 696; Indictment ¶ 90. At the time the documents were seized, Trump had been out of office for over 1.5 years.

118. In connection with the FBI's investigation, Plaintiff Linton interviewed Trump's two employees who had helped Trump to conceal classified documents from his lawyers, the FBI, and the grand jury, and who had tried to delete Mar-a-Lago's CCTV footage after the issuance of the grand jury subpoena seeking it. Indictment ¶¶ 48, 110, 118.

119. On November 18, 2022, then-Attorney General Merrick Garland appointed Jack Smith to serve as Special Counsel to oversee Plasmic Echo.[13]

120. As part of the investigation and review of materials, Plaintiffs learned that Trump stored classified documents at Mar-a-Lago that had originated from CIA, DOD, NSA, the National Geospatial Intelligence Agency, the National Reconnaissance Office, the Department of Energy, and the Department of State's Bureau of Intelligence and Research. *Id.* ¶ 22. The classified documents that Trump illegally possessed included information regarding defense and weapons capabilities of both the United States and foreign countries; the United States' nuclear programs; information relating to the United States' and its allies' vulnerabilities to military attack; and plans for the United States' possible response to foreign attack. *Id.* ¶ 3. The unauthorized disclosure of these classified documents would put at grave risk the national security of the United States, its military, its allies, human intelligence sources, and the continued viability of sensitive intelligence collection methods and programs. *Id.*

---

[13] *See Appointment of a Special Counsel*, Dep't of Justice (Nov. 18, 2022), https://www.justice.gov/archives/opa/gallery/appointment-special-counsel.

121. In June and July 2023, a grand jury sitting in the Southern District of Florida reviewed the evidence, deliberated, and voted to return an indictment and, subsequently, a superseding indictment. Ultimately, the Indictment charged Trump and two co-conspirators collectively with 42 felony counts, including willful retention of national defense information, in violation of 18 U.S.C. § 793(e), *see id.* ¶¶ 92–93; conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k), *id.* ¶¶ 94–97; withholding a document or record, in violation of 18 U.S.C. § 1512(b)(2)(A), *id.* ¶¶ 98–99; corruptly concealing a document or record, in violation of 18 U.S.C. § 1512(c)(1), *id.* ¶¶ 100–01; concealing a document in a federal investigation, in violation of 18 U.S.C. § 1519, *id.* ¶¶ 102–03; scheme to conceal, in violation of 18 U.S.C. § 1001(a)(1), *id.* ¶¶ 104–05; false statements and representations, in violation of 18 U.S.C. § 1001(a)(2), *id.* ¶¶ 106–12; altering, destroying, mutilating, or concealing an object, in violation of 18 U.S.C. § 1512(b)(2)(B), *id.* ¶¶ 113–14; and corruptly altering, destroying, mutilating, or concealing an object, in violation of 18 U.S.C. § 1512(c)(1), *id.* ¶¶ 115–16.

122. As Plaintiffs' Plasmic Echo work and duties wound down by mid-2024, they resumed work on other investigations. Between mid-2024 and their unlawful terminations in February 2026, Plaintiffs advanced important high-profile investigations and received numerous awards for their work at the FBI. Plaintiffs performed their duties faithfully, including throughout the first year of the second Trump administration. Indeed, as discussed above, Defendant Patel himself recognized several of the Plaintiffs for their outstanding performance and contributions to the FBI during 2025.

### C. While Still a Private Citizen, Defendant Patel Injected Himself into Plasmic Echo

123. Even before Defendant Patel became Director of the FBI, he injected himself into the Plasmic Echo investigation. Patel's statements and conduct reflect his long-standing bias and

personal animus toward Plaintiffs, which motivated his decision to terminate them unlawfully in February 2026.

124. In May 2022—years before he was ever employed by the FBI and while the Plasmic Echo investigation was ongoing—Patel claimed, without support, that Trump had "declassified whole sets of materials" and that the White House counsel had simply failed to complete the paperwork necessary to change the documents' classification markings.[14] Patel further claimed that he had personally been present when Trump stated: "[w]e are declassifying this information."[15]

125. Patel's claims are belied by the facts in the Indictment and the actions and statements of Trump and his associates. For example, on July 21, 2021, when Trump provided a classified DOD presentation about a draft plan for military activity in a foreign country to a writer and publisher, the document was still marked "TOP SECRET//NOFORN." Indictment ¶¶ 35, 93. This is among the highest classifications a document can hold. *Id.* ¶¶ 14, 15. While attempting to provide that document to the writer, Trump admitted that the presentation was "like, highly confidential" "secret information." *Id.* ¶ 34. When a member of Trump's staff suggested it would need to be declassified before it could be provided to the writer, the following exchange occurred:

| | |
|---|---|
| TRUMP: | This was done by the military and given to me. Uh, I think we can probably, right? |
| STAFFER: | I don't know, we'll, we'll have to see. Yeah, we'll have to try to- |
| TRUMP: | Declassify it. |
| STAFFER: | —figure out a—yeah. |
| TRUMP: | See as president I could have declassified it. |
| STAFFER: | Yeah. *[Laughter]* |
| TRUMP: | Now I can't, you know, but this is still a secret. |
| STAFFER: | Yeah. *[Laughter]* Now we have a problem. |

[14] Kristina Wong, *Documents at Mar-a-Lago Marked 'Classified' Were Already Declassified, Kash Patel Says*, Breitbart (May 5, 2022), https://www.breitbart.com/politics/2022/05/05/documents-mar-a-lago-marked-classified-were-already-declassified-kash-patel-says/.

[15] *Id.*

TRUMP: Isn't that interesting?

*Id.* ¶¶ 34–35.

126. In addition, as documented in the affidavit accompanying the court-authorized search warrant for Mar-a-Lago, when one of Trump's lawyers transferred a package containing 38 classified documents to the FBI on June 3, 2022, the envelope was prepared in a way that suggested a misguided attempt to secure classified information ("a single Redweld envelope, wrapped in tape, containing documents"). *In re Sealed Search Warrant*, ¶¶ 55, 60. Neither the attorney nor the person who accompanied the attorney made any claim that Trump had declassified the documents. *Id.* ¶ 60.

127. Despite the dissonance between Patel's assertions and the facts and evidence uncovered by the investigation, Patel repeatedly and baselessly condemned the Plasmic Echo investigation in the years before becoming the FBI Director. For example, the day after the FBI executed the search warrant at Mar-a-Lago in August 2022, Patel called the search—which had been authorized by a federal magistrate judge—"unlawful" and falsely accused the FBI agents involved in the search of being "corrupt government gangsters" who were engaged in "the blatant weaponization of our government for political gain."[16]

128. In September 2022, after Patel had publicly claimed personal knowledge that Trump had declassified the materials that he unlawfully retained at Mar-a-Lago, Plaintiffs Linton and Ray served Patel with a subpoena commanding him to testify before the grand jury.[17] Patel moved to quash the subpoena, but the court denied his motion and ordered him to testify.[18] When he eventually appeared to testify, Patel repeatedly invoked his Fifth Amendment privilege against

---

[16] Mike Levine & Katherine Faulders, *Outspoken Trump Ally Kash Patel Goes Mum as Mar-a-Lago Probe Progresses*, ABC News (Oct. 28, 2022), https://www-cdn.abcnews.com/Politics/outspoken-trump-ally-kash-patel-mum-mar-lago/story?id=92282495.

[17] *See* Op. at 3, *In re Kashyap Patel*, No. 25-mc-7 (JEB) (D.D.C. July 21, 2025), ECF 17.

[18] *Id.*

self-incrimination.[19] DOJ then moved to compel Patel's testimony.[20] The court granted DOJ's motion contingent on Patel receiving immunity for his testimony.[21] After he was granted immunity, Patel returned to the grand jury and testified.[22]

129. Around the same time, the Special Counsel's Office issued a grand jury subpoena for phone records associated with Patel—a fact that Patel later publicly disclosed to the media on or about February 25, 2026, as described below.[23] Patel revealed that the subpoena had sought, among other things, call and text metadata, subscriber information, account identifiers, billing and IP addresses, and other billing information, but not the contents of any phone calls or text messages.[24]

130. On or about February 22, 2026, a video of Defendant Patel chugging a beer and, in a display of wild immaturity and lack of personal control, flinging alcohol around the U.S. men's hockey team's locker room at the Winter Olympics in Milan, Italy, began circulating widely on social media and news sites.[25] On its face, Patel's behavior demonstrated a remarkable lack of discipline and a failure to appreciate the gravity of his position and responsibilities as the Director of the FBI, particularly given that they occurred at a time when U.S. law enforcement and national security matters should have been commanding his undivided attention. For example, while Patel

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Jana Winter, *FBI Obtained Kash Patel and Susie Wiles Phone Records During Biden Administration*, Reuters (Feb. 25, 2026), https://www.reuters.com/world/us/fbi-obtained-kash-patel-susie-wiles-phone-records-during-biden-administration-2026-02-25/.
[24] Jana Winter, *FBI Investigation into Kash Patel Was More Extensive Than Previously Reported*, Reuters (Mar. 24, 2026), https://www.reuters.com/legal/government/fbi-investigation-into-kash-patel-was-more-extensive-than-previously-reported-2026-03-24/.
[25] *See, e.g.*, Video posted by CNN (@cnn), TikTok (Feb. 23, 2026), https://www.tiktok.com/@cnn/video/7610046383709555982; Alexander Smith, *FBI Head Kash Patel Celebrates With Men's Hockey Team Amid Major Probes in U.S*, NBC News (Feb. 23, 2026), https://www.nbcnews.com/news/us-news/kash-patel-fbi-celebrates-mens-hockey-team-winter-olympics-milan-video-rcna260215.

was overseas and apparently rendering himself unavailable for his duties, an armed intruder was shot while attempting to breach Mar-a-Lago.[26] And six days after Patel's locker-room incident in Milan, the United States initiated a war with Iran. Patel's conduct in Italy in the week leading up to the war suggests he was not a central part of any planning within the Executive Branch for the national security consequences of the conflict. This scandal proved politically perilous for Patel: he drew widespread criticism for his conduct, with numerous sources suggesting that his status with President Trump and position as Director of the FBI were in jeopardy as a result.[27]

131. On February 25, 2026, in an apparent attempt to break the news cycle and get back into President Trump's good graces, Patel disclosed to Reuters that his phone toll records (timestamps of phone calls and text messages, but not the content of any communications) and those of White House Chief of Staff Susie Wiles (who at the time of the Plasmic Echo investigation was serving as an advisor to Trump) had been subpoenaed in connection with the Special Counsel's investigations of Trump.[28] Again demonstrating his personal hostility toward the Plasmic Echo investigation, Patel described the subpoenas as "outrageous" and asserted that they rested on "flimsy pretexts." Patel conceded, however, that "he did not know the FBI's purpose in seizing the phone records of him and Wiles." Patel complained that the phone records had been placed in the FBI's restricted files ("prohibited case files") to evade oversight. But investigatory files in SIMs often have restricted access in order to better safeguard information and reduce the risk of media leaks related to sensitive targets. Patel's statements regarding the subpoenas to a

---

[26] Megan Brand *et al.*, *Law Enforcement Shoots and Kills Armed Man Trying to Enter Mar-a-Lago, Secret Service Says*, NBC News (Feb. 22, 2026), https://www.nbcnews.com/politics/donald-trump/law-enforcement-shoots-kills-man-mar-lago-secret-service-rcna260141.

[27] Ryan J. Reilly et al., *Trump told FBI Director Kash Patel he didn't like his Olympics hijinks*, NBC News (Feb. 27, 2026), https://www.nbcnews.com/politics/trump-administration/trump-fbi-director-kash-patel-olympics-hijinks-rcna260835.

[28] Jana Winter, *FBI Obtained Kash Patel and Susie Wiles Phone Records During Biden Administration*, Reuters (Feb. 25, 2026), https://www.reuters.com/world/us/fbi-obtained-kash-patel-susie-wiles-phone-records-during-biden-administration-2026-02-25/.

news outlet appear to have violated the gag order issued by the federal judge who oversaw matters related to the classified documents case based on DOJ's own interpretation of that order.[29] On the same day that he provided the information about the subpoenas to Reuters, Patel summarily fired Plaintiffs Bacon, Feldman, Granados, Herrera, Kaufman, Linton, Matanic, and Vaccaro. Patel fired Plaintiff Ray the following day. In the article, three unnamed FBI "sources" linked the Plaintiffs' terminations to the "revelations" about the phone records subpoenas in the classified documents case.[30]

### D. Defendants Publicly Impugn Plaintiffs and Smear Their Work as Politically Motivated

132. Plaintiffs performed their assigned work on the Plasmic Echo investigation with the same apolitical integrity and diligence that characterized their work on other investigations. Nevertheless, before and after Trump returned to office, Trump, Defendant Patel, and others in Trump's orbit falsely portrayed the investigations into Trump—and the career personnel who worked on them, including Plaintiffs—as products of partisan "weaponization" of the DOJ and the FBI.[31]

133. For example, in a May 2022 interview with Breitbart News Network before he became FBI Director, Patel stated that the FBI's investigation into Trump's unlawful retention of documents was a "disinformation campaign designed to break the public trust in a president that

---

[29] Order Prohibiting Volume II Release; Deposition Testimony of Jack Smith, Committee on the Judiciary, U.S. House of Representatives, Dec. 17, 2025, at 13:12–20, available at https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/2025-12/Smith-Depo-Transcript_Redacted-w-Errata.pdf.
[30] Winter, *supra* n.28.
[31] *See* Exec. Order No. 14,147, Ending the Weaponization of the Federal Government, 90 Fed. Reg. 8235, 8235 (Jan. 28, 2025).

lived on transparency. It's yet another way to attack Trump."[32]

134. On August 9, 2022, Trump's political action committee ("PAC") released a statement that Mar-a-Lago was "under siege, raided, and occupied by a large group of FBI agents."[33] Three days later, Trump posted a message on Truth Social accusing the DOJ and FBI of "playing politics" and of "breaking into Mar-a-Lago."[34]

135. On September 3, 2022, at a rally in Wilkes-Barre, Pennsylvania, Trump characterized the FBI's execution of the search warrant at Mar-a-Lago as a "shameful raid" and an "inva[sion]" that "trampled upon" his "civil liberties."[35] Going even further, Trump proclaimed that "[t]he FBI and the Justice Department have become vicious monsters controlled by radical left scoundrels, lawyers and the media who tell them what to do."[36] This openly political hyperbole contrasted with the ensuing civil litigation related to the search of Mar-a-Lago, where Trump himself conceded that the FBI had not demonstrated a "callous disregard" for his rights.[37]

136. Later that year, in an opinion piece for Fox News, Patel wrote: "The FBI has abused its counterintelligence mission to target the Democrats' political opponents, including unrelenting attacks on Trump from his candidacy, throughout his presidency, and continuing with the unprecedented raid on Mar-a-Lago."[38] Again, Patel's uninformed and predetermined conclusions

[32] Kristina Wong, *Documents at Mar-a-Lago Marked 'Classified' Were Already Declassified, Kash Patel Says*, Breitbart (May 5, 2022), https://www.breitbart.com/politics/2022/05/05/documents-mar-a-lago-marked-classified-were-already-declassified-kash-patel-says/.

[33] Deepa Shivaram & Ryan Lucas, *Trump Says FBI Agents Searched His Mar-a-Lago Home in Florida*, NPR (Aug. 8, 2022), https://www.npr.org/2022/08/08/1116427430/trump-says-fbi-agents-raided-his-mar-a-lago-home-in-florida.

[34] Donald J. Trump, (@realDonaldTrump), Truth Social (Aug. 12, 2022, at 2:19 PM), https://truthsocial.com/@realDonaldTrump/posts/108811278444540886.

[35] Donald J. Trump, Remarks at a Rally in Wilkes-Barre, Pennsylvania, The Am. Presidency Project (Sep. 3, 2022), https://www.presidency.ucsb.edu/documents/remarks-rally-wilkes-barre-pennsylvania.

[36] *Id.*

[37] *Trump*, 54 F.4th at 698 (noting that the plaintiff did not argue there had been a callous disregard for his constitutional rights in the execution of the search warrant).

[38] Kash Patel, *GOP Needs New 'Church Committee' to Hold FBI, Justice Department Accountable for Their Many Abuses*, Fox News (Nov. 4, 2022), https://www.foxnews.com/opinion/gop-needs-new-church-committee-hold-fbi-justice-department-accountable-their-many-abuses.

were driven by political bias, not any actual review of Plaintiffs' lawful investigative work.

137. Two weeks before taking office for his second term, then-President-elect Trump wrote on Truth Social: "Deranged Jack Smith, the evil and sinister prosecutor appointed by Crooked Joe Biden to 'take me down,' was found to be illegally appointed by a CORRUPT DOJ and FBI, and all of his many charges against me were dropped or dismissed. His illegal raid of my home, Mar-a-Lago, will go down as one of the 'dirtiest tricks' ever perpetrated by one candidate, a dumb as a rock, Sleepy Joe Biden, on another."[39]

138. Since President Trump returned to office in January 2025, he, Defendant Patel, Defendant Blanche, and others within Trump's Administration have continued to smear Plaintiffs' reputations and attack their integrity.

139. On January 20, 2025, the White House declared that the prior administration had engaged in a "systematic campaign against its perceived political opponents" through federal law enforcement investigations and prosecutions and directed the Attorney General to review federal law-enforcement activity for instances of alleged misconduct.[40]

140. On February 5, 2025, then-Attorney General Pamela Bondi established a "Weaponization Working Group" to facilitate that review.[41] Bondi's memorandum establishing the Weaponization Working Group prominently identified Special Counsel Jack Smith, his staff, and "the prosecutors and law enforcement personnel who participated in the unprecedented raid on President Trump's home" as examples of purported "Weaponization."[42]

141. In a March 2025 interview, then-Attorney General Bondi attributed anti-Trump

---

[39] Donald J. Trump, (@realDonaldTrump), Truth Social Post (Jan. 4, 2025 at 8:03 AM), https://truthsocial.com/@realDonaldTrump/posts/113770221063957382

[40] Ending the Weaponization of the Federal Government, 90 Fed. Reg. 8235, at 8235

[41] Memorandum from the Att'y Gen. to All Dep't Employees, Restoring the Integrity and Credibility of the Department of Justice at 1 (Feb. 5, 2025), https://www.justice.gov/ag/media/1388506/dl.

[42] *Id.* at 2.

animus more directly to personnel within DOJ and the FBI. Bondi stated that the administration was "getting rid of the worst of the worst" and seeking to identify employees in the FBI and DOJ who "despise Donald Trump" and "despise us." She promised: "We're going to root them out[,] [w]e will find them, and they will no longer be employed."[43]

142. In September 2025, then-White House Press Secretary Karoline Leavitt rejected the suggestion that the Trump Administration itself was weaponizing DOJ, instead stating that "[i]t is not weaponizing the Department of Justice to demand accountability for those who weaponize the Department of Justice."[44]

143. On October 7, 2025—the day after the FBI fired Michelle Ball (an FBI agent assigned to Arctic Frost, the investigation into Trump's efforts to overturn the results of the 2020 election that was led by the same Special Counsel to whom Plaintiffs reported in connection with Plasmic Echo)—Defendant Patel told Fox News that the FBI was "cleaning up a diseased temple," "identifying the rot," and "removing those who weaponized law enforcement for political purposes."[45] Patel then announced that the FBI had fired employees who "acted unethically."[46]

144. That same month, President Trump stated at a news conference that "there's never been so much political crime against a political opponent as what I had to go through. They raided

[43] Ruth Marcus, *Pam Bondi's Power Play*, The New Yorker (Aug. 18, 2025), https://www.newyorker.com/magazine/2025/08/25/pam-bondi-profile.

[44] Josephine Walker, *White House Backs Trump's Prosecutions, Blasts 'Gaslighting' Critics*, Axios (Sep. 22, 2025), https://www.axios.com/2025/09/22/white-house-defend-trump-prosecutions.

[45] Rachel Wolf & Brooke Singman, *FBI Fires Agents, Dismantles Corruption Squad After Probe Unveils Monitoring of GOP Senators, Patel Says*, Fox News (Oct. 7, 2025), https://www.foxnews.com/politics/fbi-fires-agents-dismantles-corruption-squad-after-probe-unveils-monitoring-gop-senators-patel-says.

[46] Brady Knox, *FBI Fires Agents Who 'Weaponized Law Enforcement' Against U.S. Citizens, Patel Says*, Washington Exam'r (Oct. 7, 2025), https://www.washingtonexaminer.com/news/justice/3841156/fbi-fires-agents-weaponized-law-enforcement-kash-patel/.

my house in Florida."[47]

145. After Plaintiffs were unlawfully terminated in February 2026, a reporter posted on X that "FBI Director Kash Patel fired a dozen FBI agents and staff as retribution for a Trump probe. The group Patel targeted? An elite counterespionage unit that specializes in Iran."[48] Ben Williamson, Assistant Director for Public Affairs at the FBI, responded: "Correction: the FBI Director fired people who were found to have acted unethically and violated the mission. And now some of those people are claiming they were the key holding everything together all along. Respectfully you have to be an idiot to buy this narrative."[49] In fact, none of the Plaintiffs spoke with the press following their firing or made any such claim.

146. Senior DOJ leadership, including Defendant Blanche, described the firings of FBI employees similarly. At the March 2026 Conservative Political Action Conference, then-Deputy Attorney General Blanche said that the DOJ had "cleaned house" at the FBI.[50] Blanche further stated that there "isn't a single man or woman with a gun, federal agent, still in that organization that had anything to do with the prosecution of President Trump,"[51] and asserted that more than 200 people involved in Trump-related prosecutions had either left or were forced to leave the Department.[52]

147. Patel also made statements to Congress that conflict with the facts of Plaintiffs'

---

[47] Donald J. Trump, The President's News Conference, The Am. Presidency Project, (Oct 15, 2025), https://www.presidency.ucsb.edu/documents/the-presidents-news-conference-1273.
[48] Natasha Korecki (@natashakorecki), X (Mar. 2, 2026, at 8:43 PM), https://x.com/natashakorecki/status/2028662446215340036.
[49] Ben Williamson (@_WilliamsonBen), X (Mar. 4, 2026, at 12:23 AM), https://x.com/_WilliamsonBen/status/2029065049025761532.
[50] Ryan J. Reilly, *Ex-FBI Agents on Trump Cases Cite Todd Blanche's Remarks in Suit over 'Illegal' Firings*, NBC News (Mar. 31, 2026), https://www.nbcnews.com/politics/justice-department/ex-fbi-agents-trump-cases-cite-todd-blanches-remarks-suit-illegal-firi-rcna266039.
[51] *Id.*
[52] Mica Soellner, *Blanche Says DOJ Has 'Cleaned House' of Trump Foes*, Bloomberg Gov't (Mar. 26, 2026), https://news.bgov.com/bloomberg-government-news/blanche-says-doj-has-cleaned-house-of-trump-foes.

terminations. For example, on March 19, 2026, he testified before the House Permanent Select Committee on Intelligence at its annual worldwide-threats hearing.[53] Representatives questioned him about the termination of FBI personnel who reportedly worked on Iranian threats and the investigation of President Trump's handling of classified documents.

148. In response to a question by Representative Steve Cohen about why Patel had fired counterintelligence personnel before military operations began in Iran, Patel falsely claimed that "when these terminations occur, there are internal investigations conducted by the careers at the FBI that highlight unethical or inappropriate conduct, and it's up to me to make the decision."[54] In fact, there was no internal FBI investigation into any of the Plaintiffs' conduct, much less any findings of "unethical" or "inappropriate" conduct. Patel also claimed to not know details about whom he had fired. In response to a question about whether Plaintiffs were "experts on Iran," Patel responded, "I don't believe so."[55] When asked whether Plaintiffs worked on counterintelligence matters, Patel stated that he was "not familiar."[56]

149. Pressed further by Representative Cohen, Patel stated that "people were terminated for violating their ethical obligations and the high standards that they upheld."[57] In fact, none of the Plaintiffs' official termination paperwork—the Standard Form 50 ("SF-50"), Notification of Personnel Action—indicates a "for cause" or performance-based termination. Furthermore, two Plaintiffs—Bacon and Ray—were provided "letters of good standing" in accordance with 18 U.S.C. § 926B-C, the Law Enforcement Officers Safety Act ("LEOSA") of 2010. Under LEOSA,

---

[53] 2026 Worldwide Threats Hearing (Open), U.S. House Permanent Select Comm. on Intel. (Mar. 19, 2026), https://intelligence.house.gov/event/2026-worldwide-threats-hearing-open/.
[54] *2026 Worldwide Threats Hearing (Open),* Hearing Before the House Permanent Select Committee on Intelligence, 119th Cong. 77 (2026) (POLITICO Pro) (statement of Kash P. Patel, Director, FBI).
[55] *Id.* at 78.
[56] *Id.*
[57] *Id.*

retired or separated federal law enforcement officers are allowed to carry concealed firearms after their service has ended. For former FBI agents, the Bureau has to confirm that they were in "good standing" at the time of their separation, and it did so for Plaintiffs Bacon and Ray.

150. Asked by Representative Chrissy Houlahan about whether Plaintiffs had been dismissed because they participated in the Mar-a-Lago investigation, Patel again (falsely) referred to "internal investigation[s]" purportedly conducted by career personnel into "violat[ions of] their code of conduct or ethical standard," followed by the supposed "present[ion of] a decision" to Patel.[58] As set forth here, none of the Plaintiffs were ever informed of any investigation into any such alleged violation. When pressed further about whether Plaintiffs' terminations were tied to their work on the Plasmic Echo investigation, Patel stated that he "can't comment on [the firings] because those are pending in litigation."[59] In fact, besides a single claim filed by Linton to the Merits Systems Protection Board, none of Plaintiffs' firings were "pending in litigation" at the time of Patel's statement.

151. On September 15, 2026, Director Patel testified before the Senate Judiciary Committee at an FBI oversight hearing.[60] Senators questioned him about the removal of personnel involved in investigations concerning President Trump, including personnel from the counterintelligence unit that monitored Iranian threats.

152. In response to a question from Senator Richard Blumenthal about Plaintiffs' expertise in monitoring threats from Iran, Patel responded that "you can define them as experts,

[58] *2026 Worldwide Threats Hearing (Open),* Hearing Before the H.R. Permanent Select Comm. on Intelligence, 119th Cong. 77 (2026) (POLITICO Pro) at 59.
[59] *Id.*
[60] *Oversight of the Federal Bureau of Investigation*, Hearing Before the S. Comm. on the Judiciary, 119th Cong. (2026), https://www.judiciary.senate.gov/committee-activity/hearings/oversight-of-the-federal-bureau-of-investigation-09-15-2026.

but they definitely are not."[61] In fact, they were. He touted that under his leadership, the FBI "arrested 55% more spies from Iran than any FBI in the history of the United States of America."[62] Those statistics, if true, would have been based off Plaintiffs' work, having just been fired only one month prior to Patel making the claim. Patel again stated unequivocally to Senator Blumenthal that Plaintiffs "were terminated for weaponizing the Federal Bureau of Investigation."[63]

153. In response to questions from Senator Adam Schiff about Plaintiffs' firings, Patel responded that Plaintiffs were not fired "for the simple fact of working on those investigations" but instead only if they "weaponized law enforcement."[64] He also (falsely) claimed that "a lot of [Plaintiffs] retired." None of the Plaintiffs retired. When Senator Schiff asked whether the dismissed agents had engaged in some other malfeasance beyond their assignments, Patel falsely testified that "there's an entire inspection division at the FBI that looked at the totality of not just these agents and employees, but everybody on a constant basis, and they make recommendations." In fact, the FBI's Inspection Division did not conduct any investigations into Plaintiffs.

### E. Plaintiffs Are Summarily Terminated

154. Over two days in February 2026, Defendants summarily terminated each Plaintiff's employment with the FBI unlawfully. Each Plaintiff was provided with a termination letter signed by Director Patel that invoked "Article II" and falsely claimed that each Plaintiff had "exercised poor judgment and a lack of impartiality in carrying out duties, leading to the political weaponization of the government." *See* Exhibit ("Ex.") A. However, each Plaintiff received an SF-50 recording their terminations and indicating that they were not "for cause" firings. Ex. B.

---

[61] *Senate Judiciary on FBI Oversight (Open)*, Hearing Before the Senate Judiciary Committee, 119th Cong. 77 (2026) (POLITICO Pro) at 62.
[62] *Id*.
[63] *Id*. at 63.
[64] *Id*. at 130.

Nor could Plaintiffs have been terminated for cause. None of the Plaintiffs have ever had any instances of misconduct or poor behavior while employed with the FBI. Prior to their firings, there were no internal investigations into Plaintiffs' conduct or any findings of wrongdoing. Nor were Plaintiffs afforded any advance notice, a hearing, or an opportunity to be heard or to appeal their terminations. In many instances, Plaintiffs' immediate supervisors expressed disbelief and regret that Plaintiffs' FBI careers had been ended.

**1. Jennifer Bacon's Firing**

155. On the afternoon of Monday, February 23, 2026, the day after Patel's locker room incident in Milan, Assistant Director Roman Rozhavsky forwarded Bacon an email sent to him from Special Agent Miles Starr. At the time, Starr was detailed to an unofficial unit known as the "Director's Advisory Team" ("DAT") established by Patel, which is composed of individuals who report directly to FBI headquarters and appear to work on investigations into perceived political enemies of the President. For example, Starr provided grand jury testimony in the ill-fated first indictment of former FBI Director James Comey.[65] His testimony was sharply criticized by a magistrate judge assigned to the case as being "highly irregular and a radical departure from past DOJ practice" involving potential attorney-client privilege issues.[66]

156. In sum and substance, Starr's email communicated that he urgently needed to access the Plasmic Echo case files because he had to complete a project by the end of the day for Patel. Because Plasmic Echo was a SIM, FBI policy dictated that access be restricted solely to those individuals assigned to the case to protect the subject of a SIM investigation from unnecessary reputational harm while an investigation remains in "pending" status and to prevent

---

[65] Criminal Case Cover Sheet, *United States v. Comey*, No. 25-cr-272-MSN (E.D. Va. Sep. 25, 2025), ECF 7.
[66] Mem. Op., *Comey*, No. 25-cr-272-MSN (E.D. Va. Nov. 17, 2025), ECF 191.

the unauthorized disclosure, leaks, or spillage of sensitive information related to uncharged individuals. Thus, Starr did not have automatic access to the case. Starr did not explain what he needed, but stated that he was on instructions from Patel to access the case file. Bacon granted him access to all Plasmic Echo files in the FBI's case management system, with the exception of one specific subfile.

157. The files Starr had access to contained the names of all nine Plaintiffs.

158. Thus, by the evening of February 23, 2026, Starr—who reported directly to Patel and who had been ordered by Patel to access the Plasmic Echo file—had access to each of Plaintiffs' names and the roles of each member of the classified documents case team.

159. Less than 48 hours after granting Starr access, on the afternoon of February 25, 2026, Plaintiff Bacon was called out of a meeting and informed that she was being terminated.

160. Bacon was brought to Rozhavsky's office in FBI Headquarters, where Rozhavsky and Deputy Assistant Director Fred Marcks were waiting. Rozhavksy provided Bacon with a termination letter that Director Patel had signed. When Bacon asked why she was being fired, Rozhavsky replied that he did not know the specific reason, but that it was related to Mar-a-Lago. Prior to her termination, Bacon was never informed that she was under investigation by the DOJ's Office of Professional Responsibility ("OPR"), Office of Inspector General ("OIG"), FBI's Inspection Division, or FBI's Security Division, which would normally have occurred.

161. Bacon was given approximately one hour to pack her office and transfer her notebooks and files to other FBI personnel. She was told she would be escorted out of the building by the end of the business day. Bacon quickly relayed outstanding action items to her team but was unable to log back onto her computer as she had already signed her termination paperwork. Bacon was not provided with Forms SF-50 or SF-52, which provide notice of personnel actions

like terminations, until weeks later.

**2. Zach Feldman's Firing**

162. On February 25, 2026, as Plaintiff Feldman was about to leave the office for the day, his supervisor asked him to wait. Upon direction from the Assistant Special Agent in Charge ("ASAC"), Feldman walked to SAC Daniel Wierzbicki's office, where ADIC Cox informed Feldman he was being fired and handed Feldman a termination letter that Director Patel had signed.

163. Feldman asked if either ADIC Cox or SAC Wierzbicki had any additional information that they could share with him about his termination. Both responded that they did not. Prior to his firing, Feldman was never informed that he was under investigation by OPR or OIG.

164. Feldman was then escorted to an adjacent office to speak with two members of the Employee Assistance Program ("EAP"), after which SAC Wierzbicki asked Feldman to speak again alone.

165. Wierzbicki told Feldman that he did not know but suspected that Feldman's termination was related to the news reports from earlier that day about Director Patel drinking alcohol at the Winter Olympics.[67] Wierzbicki told Feldman he had tried to "save" Special Agents from dismissal and in some cases had been successful, but in Feldman's case he was not.

166. After Feldman signed property receipts and was read out of his security clearances, he was escorted to his office and to his FBI vehicle to gather his personal belongings. Prior to his termination, Feldman was never informed that he was under investigation by OPR, OIG, FBI's Inspection Division, or FBI's Security Division. Feldman was not given the opportunity to

[67] *Kash Patel Goes Viral for Hockey Celebration*, CNN (Feb. 23, 2026), https://edition.cnn.com/2026/02/23/politics/video/kash-patel-goes-viral-for-hockey-celebration-vrtc.

transition his ongoing investigations to other FBI agents.

### 3. Gilbert Granados's Firing

167. In the late afternoon on February 25, 2026, Plaintiff Granados received a call from his Unit Chief informing Granados that he was on his way to Granados's house. That evening, Granados' Unit Chief and Deputy Assistant Director Marcks came to his house and informed him that he had been terminated, providing Granados a termination letter that Director Patel had signed. Granados asked why he was being fired, and they said they did not know. Marcks told Granados that the letter was not a reflection on who Granados was as an individual. Granados was never informed that he was under investigation by OPR, OIG, FBI's Inspection Division, or FBI's Security Division. Granados was not able to transition any of his ongoing investigations to other analysts and never returned to his office.

### 4. Catherine Herrera's Firing

168. On February 25, 2026, Plaintiff Herrera was on a train to New York while taking personal leave when she learned from Plaintiff Bacon that Bacon, Granados, and Linton had been fired. Herrera reached out to Jeremy Messinger, WFO's Acting Intelligence Analyst in Charge, to ask what he knew about the firings. Messinger responded that Herrera's name was not on the list of those FBI analysts to be terminated.

169. Late that evening, Herrera received a phone call from Cheryl Mimura, the Deputy Assistant Director at TSC, who told Herrera that she was being terminated, effective immediately.

170. Herrera asked Mimura if the dismissal was for cause. Mimura read from Herrera's termination letter that Director Patel had signed and acknowledged that she had not been provided any information supporting the decision. Mimura informed Herrera that there would be no internal appeal.

171. Mimura also told Herrera that she would need to come into the office in Northern Virginia on February 27, 2026, to have her termination processed. Mimura insisted that Herrera report at 9 a.m., the morning after Herrera returned from personal leave in New York. Mimura conveyed that she was getting pressure from the "seventh floor"—referring to FBI leadership headquartered on the seventh floor of the J. Edgar Hoover Building in Washington, D.C.—to effectuate Herrera's dismissal urgently. Mimura claimed that she needed to convince leadership not to dispatch FBI personnel to locate Herrera in New York and process her termination there. Herrera stated that her firing was wrong, and Mimura agreed.

172. On February 27, Herrera reported at 9:00 a.m. to meet with Mimura and a witness and have her termination processed. Mimura again acknowledged that she had not received any information supporting Herrera's termination, explaining that the decision was made by a small team in Director Patel's office and that nobody else knew anything beyond what was in the termination letter. Mimura stated that Herrera's firing was not for cause, and again acknowledged that she personally knew the firing was wrong.

173. Mimura handed Herrera an OPM document listing the termination codes for when a federal employee is terminated from the FBI. Mimura highlighted the action code "357" and informed Herrera that Herrera's SF-50 would include that code, which is used where none of the other termination or separation codes apply. In other words, Herrera was not being fired for cause. Herrera was never told that she had been under investigation by OPR or OIG.

174. Herrera was escorted to the Chief Security Officer ("CSO") to return her electronics and credentials. When Herrera asked the CSO about her security clearance, he told her that he usually receives direction regarding security clearances from lower-level FBI employees but that because the decision to terminate Herrera was made by more senior Bureau officials, he had no

information to support or effectuate the revocation of her security clearance.

175. Herrera was never informed that she was under investigation by OPR, OIG, FBI's Inspection Division, or FBI's Security Division. Herrera was not given the opportunity to transition her ongoing responsibilities to other analysts.

**5. Harrison Kaufman's Firing**

176. On February 25, 2026, after leaving work, Messinger contacted Kaufman by phone and told him to return to the office immediately.

177. Kaufman called Plaintiff Vaccaro to ask if she had also been contacted by Messinger, and Vaccaro confirmed that she had.

178. When Kaufman returned to the office, he met Vaccaro outside and they went up to meet Messinger. After Messinger and ADIC Cox spoke with Vaccaro, they met Kaufman in the WFO law library. ADIC Cox said something along the lines of, "Harrison, I know you [from Kaufman's time on PSAC]. Unfortunately, it's come to this." ADIC Cox then handed Kaufman a termination letter that Director Patel had signed.

179. When Kaufman asked why he and the others were being fired, ADIC Cox responded that he did not know, and that the termination had come directly from Director Patel's office earlier in the day. ADIC Cox appeared unaware as to how or if the termination would affect Kaufman's security clearance. ADIC Cox told Kaufman that this was the only information he had. Kaufman was never informed that he was under investigation by OPR, OIG, FBI's Inspection Division, or FBI's Security Division.

180. Kaufman was then "read out" of his security clearances and allowed a brief time to go on unclassified and classified FBI networks to print his personnel records. As Kaufman walked out of the building, a few individuals came down to applaud him and other Plaintiffs. Kaufman

was not given the opportunity to transition his ongoing investigations to other analysts.

### 6. Jeremy Linton's Firing

181. On the afternoon of February 25, 2026, in a Virginia office location, Plaintiff Linton's supervisor came to Linton's desk and escorted him to the office of Don Holstead, the Assistant Director of the FBI's Counterterrorism Division. Holstead gave Linton a termination letter that Director Patel had signed. Linton later understood that Holstead, instead of Rozhavsky of the Counterintelligence Division, provided the letter due to the latter's unavailability. Specifically, at that time, Rozhavsky was providing a termination letter to Plaintiff Bacon in Washington, D.C. When Linton asked about the basis for his firing, Holstead responded that he did not know. Holstead later stated to Linton, in sum and substance, that he should walk out of the building "with [his] head held high and with [his] dignity because [he] earned it." Linton had never been told that he was under investigation by OPR, OIG, FBI's Inspection Division, or FBI's Security Division.

182. At the time Linton was fired, he was managing a portfolio that included active Iran counterintelligence cases. Linton was terminated just three days before the United States commenced strikes in Iran as part of the first phase of the war. Linton was not afforded time to transition his work on these or any other matters to other agents before his termination.

### 7. Erin Matanic's Firing

183. On February 25, 2026, after leaving work for the day, Plaintiff Matanic received a call from Messinger, WFO's Acting Intelligence Analyst in Charge. Messinger told Matanic to report to the NVRA office immediately, although he could not say over the phone why. Matanic then called her two supervisors. One told her that he had not heard anything about her potential termination, and the other instructed her to come to the NVRA office.

184. When Matanic arrived there, Phillip Bates, the Special Agent in Charge of Mission Services, handed Matanic a termination letter that Director Patel had signed. Matanic asked Bates how he was informed of the FBI's decision to fire her. Bates replied that he received a call from ADIC Cox informing him that termination letters needed to be presented to a list of individuals that day—no matter what—and that those individuals needed to be fired that day. Bates acknowledged, without elaborating, that Matanic's firing was different from ordinary terminations and that Bates could "read through the lines." Prior to her firing, Matanic was never informed that she was under investigation by OPR, OIG, FBI's Inspection Division, or FBI's Security Division. Bates told Matanic that he was sorry for her.

185. Matanic was terminated without the opportunity to transition her ongoing investigations to other analysts.

**8. Danielle Ray's Firing**

186. On February 26, 2026, Plaintiff Ray reported to the WFO as normal, even though she knew that several of her former squad members had been terminated the day before. That afternoon, Ray's SSA informed her that she was to meet with Phillip Bates, who was serving as the Acting Assistant Director of WFO that day while ADIC Cox was presumably off duty.

187. Ray met with Bates, SAC Wierzbicki, and the ASAC. Bates provided Ray with a termination letter that Director Patel had signed. Bates stated that he did not know why Ray was being fired, other than what was contained in Director Patel's letter. Ray asked whether there were any specific allegations of misconduct or performance issues, and Bates confirmed that he was aware of none. Ray asked if she would be afforded the opportunity to respond to the allegations or appeal the termination decision, and Bates answered that she would not, unless she was eligible to appeal her removal through the Merits Systems Protection Board ("MSPB"). Ray was never

told that she was under investigation by OPR, OIG, FBI's Inspection Division, or FBI's Security Division.

188. Ray was handed a form that was described as her final SF-50 "Notification of Personnel Action," but the form was actually an SF-52 "Request for Personnel Action." The form indicated that the requested personnel action was "Separation," with an action code of "330" and the nature of the action listed as "Removal." The reason provided on the form was "Removal under Article II." Ray was instructed to sign the form, and she complied.

189. After Ray cleared out her FBI vehicle, she turned in her FBI property to security personnel. Before Ray was escorted out of the building, Ray's ASAC and SSA both described Ray as one of the best agents they had ever worked with at the FBI.

190. At the time of her firing, Ray was involved in several high-priority national security investigations. She was not given the opportunity to transition her ongoing investigations to other FBI investigators.

**9. Rachel Vaccaro's Firing**

191. On February 25, 2026, after leaving work to go home for the day, Vaccaro received a call from Messinger asking where she was. When Vaccaro responded that she was at home, Messinger told her that she needed to return to work immediately. Vaccaro asked if this was case-related, and Messinger replied that it was not.

192. Vaccaro tried calling several of her co-workers and supervisors to ask what was going on, but they either did not answer their phones or told her that they did not know why she was being summoned back to work. Vaccaro then received a call from Plaintiff Kaufman, who told her that he had also been contacted by Messinger and told to return to the office. They concluded that they were each likely going to be fired and agreed to meet outside the office and

walk in together. Vaccaro also learned that Plaintiffs Bacon Granados, and another employee had already been terminated.

193. While driving back to the office, Vaccaro received a call from her operational squad supervisor who said he was sorry to hear what was happening to Vaccaro and the other Plaintiffs. He told her that it was "unfair."

194. When Vaccaro arrived at the office, she met Kaufman outside, and they went up to meet with Messinger together. Messinger told Vaccaro that she would go first. Kaufman and Vaccaro told Messinger that they wanted to serve as each others' witnesses, but Messinger replied that he would act as the witness.

195. Vaccaro went into ADIC Cox's office with Messinger, where ADIC Cox handed Vaccaro a termination letter that Director Patel had signed. Vaccaro had never been informed that she was under investigation by OPR, OIG, FBI's Inspection Division, or FBI's Security Division.

196. When Vaccaro asked ADIC Cox when she would receive an SF-50, ADIC Cox replied that he did not know, so she would have to ask Human Resources. ADIC Cox also did not know whether Vaccaro's security clearance was being revoked.

197. Vaccaro was read out of her security clearances and left the building after printing her personnel records and returning her electronics and credentials. Vaccaro was not given the opportunity to transition her ongoing investigations to other analysts.

## V. <u>THE FBI'S INTERNAL POLICIES AND PROCEDURES REGARDING EMPLOYMENT, WORKPLACE PROTECTIONS, AND DISMISSALS</u>

198. FBI policies and practices provide that non-probationary Special Agents or employees, like Plaintiffs, may be removed or terminated only for job-related reasons: unacceptable performance, abuse of leave, misconduct, national security concerns, or inability to

perform the essential duties and responsibilities of their position.

199. The Bureau's written policies also establish processes that must be followed in connection with any such removal or termination.

200. Based on the FBI's policies and practices, each Plaintiff reasonably understood that he or she would not be removed from the FBI without cause, and each Plaintiff relied on that understanding in continuing to serve with the FBI and in making other family, career, and financial decisions. Indeed, each Plaintiff had marketable skills, advanced degrees, and specific expertise that they chose to put towards service to the country. Several Plaintiffs were just years away from being eligible for the early retirement option offered to Special Agents who have served 20 years and are at least 50 years of age.

### A. Performance and Development Policy

201. The FBI's *Performance and Development Program Policy Guide* (the "*Guide*") sets forth processes for periodic evaluation of Special Agents', SOSs', Analysts', and other FBI employees' performance, explains the circumstances in which they may be removed for performance reasons, and describes the procedural protections they can invoke if removal is proposed. The *Guide* defines "'Unacceptable' performance" as "performance that fails to meet the 'Inconsistent Performer' level in any Objective or Competency elements within an Employee Performance Plan."[68] After completing a two-year probationary period, Special Agents, SOSs, and Analysts, like other FBI employees, are subject to annual performance reviews.[69]

202. Possible performance-based actions are demotion, reassignment, or removal from

[68] Fed. Bureau of Investigation, Hum. Res. Div., 1083PG, Performance and Development Program Policy Guide App. C, at C-2 (2020), https://vault.fbi.gov/performance-and-development-program-policy-guide-1083pg.
[69] *Id.* §§ 4.3, 4.3.1.1, 4.3.1.3, 4.5.2.

the FBI.[70] The relevant FBI Headquarters division or field office must provide a formal recommendation justifying its proposed action.[71] A non-probationary Special Agent, SOS, or Analyst may internally appeal a proposed removal for unacceptable performance.[72] Once a decision is made on the appeal, the employee will receive a letter advising him or her of the FBI's final decision.[73]

**B. Misconduct**

203. Special Agents, SOSs, and Analysts may be removed for misconduct. The FBI has defined the misconduct for which an employee may be disciplined and a range of penalties for different forms of misconduct in its *Offense Codes and Penalty Guidelines.*[74]

204. Per FBI policy, an administrative inquiry precedes any disciplinary action.[75] After internal investigation of misconduct allegations is completed, a report of findings is forwarded for adjudication to FBI OPR, which adheres to the processes and procedures set forth in the *Office of Professional Responsibility Policy Guide* ("*OPR Policy Guide*").[76]

205. If FBI OPR determines by a preponderance of evidence that an Offense Code was violated, the adjudicator must determine an appropriate disciplinary penalty after considering a number of established factors (known as the *Douglas* factors) "including, but not limited to, consistency with precedent, the FBI's Penalty Guidelines, prior disciplinary history, and aggravating/mitigating factors."[77]

---

[70] *Id.* § 4.4.3.
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] Fed. Bureau of Investigation, Offense Codes and Penalty Guidelines Governing FBI's Internal Disciplinary Process (effective Jan. 1, 2024) ("*Offense Codes and Penalty Guidelines*").
[75] Fed. Bureau of Investigation, Office of Professional Responsibility Policy Guide § 4.2 (2021) ("*OPR Policy Guide*").
[76] *Id.* §§ 1.1, 4.2.
[77] *Id.* § 4.5; *see Offense Codes and Penalty Guidelines*, *supra* n.74 at 3.

206. The FBI Director, the Deputy Director, or the Director's designee "has the authority to review and amend any disciplinary decision issued by OPR or the FBI's appellate authorities if deemed necessary to correct an injustice or to prevent harm to the FBI. This authority can be exercised in favor of or to the disadvantage of the employee in question and includes the authority to deviate from the FBI's Penalty Guidelines, if required."[78] In other words, the relevant FBI official may assign a greater or lesser disciplinary penalty than the one that OPR determined is appropriate, but only after an allegation of misconduct has been substantiated.

207. The FBI's disciplinary policy, like its performance evaluation policy, explicitly distinguishes between probationary and non-probationary employees.[79] Generally, FBI policy provides that, unlike a probationary employee, a non-probationary employee may appeal an adverse disciplinary penalty, including removal, to the FBI's Disciplinary Review Board.[80] In exceptional circumstances, FBI policy provides that the potential disciplinary penalties for more severe misconduct include "summary dismissal"—a termination that even non-probationary employees are not permitted to internally appeal.[81]

208. The FBI's current summary dismissal policy is set forth in the *OPR Policy Guide*'s section on "Processes and Procedures" for employee misconduct cases, as one of the "Range of Potential Outcomes of OPR Adjudication."[82] The *OPR Policy Guide* states: "When: (a) the safety of the public; (b) the safety of fellow employees; (c) national security interests; or (d) other compelling or exigent considerations are at stake, the Director; [Deputy Director ("DD")]; or [Assistant Director ("AD")], OPR may summarily dismiss an employee. This authority cannot be

[78] *OPR Policy Guide*, *supra* n.75 at § 4.8.
[79] *Id.* §§ 4.6.1, 4.7.3.
[80] *Id.* §§ 4.6.1, 4.6.4.
[81] *Id.*
[82] *Id.* §§ 4.6, 4.6.1, 4.6.4.

re-delegated."[83] It also states: "Summary dismissal authority is an extraordinary remedy to be exercised only in compelling or exigent circumstances. The Director, or the Director's designee, will be notified of any summary dismissal."[84]

209. The Preamble to the current version of the *FBI's Offense Codes and Penalty Guidelines* sets forth additional details about the summary dismissal policy's application.[85] Specifically, the Preamble adds:

> Many factors are considered by OPR in determining if a summary dismissal is appropriate, including, but not limited to, the egregiousness of the misconduct, whether the misconduct is illegal/criminal, overwhelming evidence of the misconduct, or impact on the FBI's reputation. Examples include: possession of Child Sexual Abuse Material, arrest for criminal conduct, solicitation of commercial sex acts, and theft of Bureau property. These factors and examples listed are illustrative, not exhaustive, and the Bureau retains the discretion to consider any factors relevant to the case.[86]

210. As the foregoing indicates, summary dismissal is solely a disciplinary penalty; FBI policy does not authorize summary dismissal outside the context of employee misconduct that has been the subject of, and substantiated through, an internal investigation.

**C. Other Forms of Termination**

211. FBI policy allows for three other instances where an employee can be removed: abuse of leave, national security concerns, or a medically-related, non-disciplinary inability to perform the essential duties and responsibilities of their position. None of those instances apply here, nor were they cited as a reason for removal.

212. In sum, as detailed above, FBI policies set forth limited reasons why a non-probationary Special Agent, SOS, or Analyst might be removed or terminated—all of them job-

---

[83] *Id.* § 4.6.4 (citing the Director's Memorandum "Designees for the Purposes of Summary Dismissal and Disciplinary Review" (Mar. 10, 2022)).
[84] *Id.*
[85] *See Offense Codes and Penalty Guidelines*, *supra* n.74 at 3–4.
[86] *Id.*

related.

213. The FBI currently has approximately 38,000 employees total.[87] OPR data reflects that in the decade-plus between FY 2007 and FY 2018, only 351 FBI employees serving in any role were dismissed for disciplinary reasons.[88] Thus, historically, removals of non-probationary Special Agents, SOSs, and Analysts based on misconduct have been rare. On information and belief, removals of non-probationary Special Agents, SOSs, and Analysts for other reasons, such as unacceptable performance, are even rarer.

214. Guidance from supervisors, quarterly OPR emails detailing examples of misconduct and corresponding disciplinary penalties, and other FBI communications have reinforced the FBI's message to non-probationary Special Agents, SOSs, and Analysts that they may consider their employment with the FBI secure absent misconduct, extreme deficiencies in job performance, or the handful of other grounds for termination set forth in the policies detailed above.

[87] FBI (Official Website), Frequently Asked Questions, https://www.fbi.gov/about/faqs/how-many-people-work-for-the-fbi.

[88] Off. of the Inspector Gen., Dep't of Just., Review of the Federal Bureau of Investigation's Adjudication Process for Misconduct Investigations 14 (2021), https://oig.justice.gov/sites/default/files/reports/21-127.pdf ("*2021 OIG Report*").

**D. Removal Protections for Senior Executive Service and Military Veterans**

215. Plaintiff Bacon was a member of the FBI's SES and had completed her probationary period prior to her unlawful termination. Plaintiff Bacon and Plaintiff Linton are military veterans.

216. The Civil Service Reform Act of 1978 ("CSRA") is the primary framework through which most federal employees can seek review of personnel action taken against them. This includes members of the SES, which was designed to be a senior corps of civil service executives, selected for their leadership qualifications, who serve as the link between political appointees and the rest of the federal workforce. 5 U.S.C. § 3131 *et seq*.

217. But the CSRA expressly excludes FBI employees from most of its provisions, including the right to appeal removals or other adverse actions to the Merit Systems Protection Board ("MSPB"), except where the employee is a preference-eligible veteran. *Id.* § 7511(b)(8).

218. To address the gap for FBI senior leadership, Congress enacted a separate scheme, codified at 5 U.S.C. § 3151, authorizing the Attorney General to create a Senior Executive Service specific to the FBI. Importantly, Congress required that the regulations establishing the FBI SES "shall provide for removal or suspension consistent with subsections (a), (b), and (c) of section 7543." *Id.* § 3151(a)(5)(D).

219. Section 7543, in turn, sets out a "for cause" standard: a senior executive may be removed only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." *Id.* § 7543(a). The statute also mandates procedural protections, including written notice of at least 30 days, the right to respond orally and in writing and to "furnish affidavits and other documentary evidence in support of the answer," the right to representation by an attorney or other representative, and a written decision with the specific reasons for the final action. *Id.* § 7543(b). Even in an instance where an employee is suspected of committing a serious crime, the employee is still permitted seven days' notice to assemble a response. *Id.*

220. Sections 3151 and 7543 ensure that FBI SES members are not "at will" employees. They may not be terminated at the discretion of FBI leadership but only for cause, and then only in accordance with statutory procedures. Courts have recognized that these provisions create a protected property interest in continued SES employment at the FBI—that is, that senior executives are entitled to constitutional due process protections if removal or suspension is sought.

221. On information and belief, the FBI SES policy states an intent to "protect senior executives from arbitrary or capricious actions" and "provide for an executive system which is guided by the public interest and free from improper political interference."

222. In the context of adverse actions like disciplinary removals and suspensions, on information and belief, FBI SES Policy echoes 5 U.S.C. § 7543(a), providing that an "[a]ction may be taken against a member of the SES for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function."

223. The FBI SES policy also echoes Section 7543 in ensuring that non-probationary FBI SES members have certain rights in the event of such an action, including, for example, advance written notice, a reasonable time to answer orally and in writing and to furnish supporting evidence, representation, a written decision, and notice of any proposed adverse action (and a right to review supporting material).

224. As preference-eligible military veterans, *see* 5 U.S.C. § 2108(3), Plaintiffs Bacon and Linton also have a separate statutory basis for removal protections. Because both Bacon and Linton fall within the definition set forth in 5 U.S.C. § 7511(a)(1)(B), they are therefore entitled to the "cause and procedure" protections of 5 U.S.C. § 7513. Those protections include removal only for "such cause as will promote the efficiency of the service," advance written notice of the specific reasons for the proposed action, an opportunity to respond, representation, a written decision, and a right to appeal to the Merit Systems Protection Board ("MSPB"). *Id.* Defendants abided by none of these statutory requirements prior to Plaintiffs' firing.

**E. The Merits Systems Protection Board**

225. In a normal termination, Plaintiffs Bacon and Linton would be able to seek recourse through the MSPB. However, while they are each considered a "covered employee" under the CSRA and entitled to its protections, the CSRA's MSPB channeling provisions do not account for purported "Article II" terminations, as reflected in the letters that each Plaintiff received from Defendant Patel. *See* Ex. A.

226. The MSPB's appellate jurisdiction reaches only an action "taken under" 5 U.S.C. § 7513, that is, a removal for "such cause as will promote the efficiency of the service." 5 U.S.C. §§ 7513(a), (d). Director Patel's termination letters were devoid of any justification under Section 7513. Ex. A. Because a removal not "taken under" Section 7513 is not an action the MSPB is

empowered to review, it falls outside the CSRA's channeling provisions and lies instead within this Court's jurisdiction under 28 U.S.C. § 1331.

227. In addition, any complaint filed before the MSPB would be futile and constitutionally unsound based on the current structure of the MSPB.[89]

228. The CSRA established the MSPB as an independent agency consisting of three members, each appointed by the President with the advice and consent of the Senate to serve seven-year terms. 5 U.S.C. §§ 1201, 1202(a). The MSPB is a quasi-judicial body, designed to resolve disputes including federal employees' allegations that their government employers discriminated against them, retaliated against them for whistleblowing, violated protections for veterans, or otherwise subjected them to an unlawful adverse employment action or prohibited personnel practice. *Id.* §§ 1204.

229. No more than two members of the MSPB are permitted to be from the same political party, to ensure that federal employees are "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." 5 U.S.C. §§ 1201, 2301(b)(8)(A).

230. Due in part to President Trump's termination of an MSPB member before the expiration of her term, the MSPB currently consists of only two members, both of whom are affiliated with the same political party. In other words, the Board is permanently changed. Indeed, leadership at the MSPB has directed staff to stop describing the board as "independent."[90]

---

[89] In an abundance of caution, and to preserve any applicable rights and remedies, Plaintiffs Bacon and Linton filed timely appeals with the MSPB challenging their terminations. They have expressly reserved their right to pursue legal action in district court.

[90] Drew Friedman, *After Slaughter Decision, MSPB No Longer Calling Itself "Independent,"* Federal News Network (July 21, 2026), https://federalnewsnetwork.com/management/2026/07/after-slaughter-decision-mspb-no-longer-calling-itself-independent/.

231. The asserted scope of presidential control extends beyond MSPB members to the adjudicators who conduct hearings and issue initial decisions. The Executive Branch has taken the position that statutory protections limiting the removal of administrative judges are unconstitutional and has declined to defend those protections in court.[91]

232. At the same time, as a result of a series of changes and pronouncements issued by the Executive Branch, MSPB adjudicators effectively may not adopt legal interpretations that conflict with the Executive Branch's positions, collapsing the Board's adjudicatory function into the chain of command whose actions it is tasked with reviewing. With respect to this administration's novel "Article II" firings in particular, conflicting statements from various corners of the government have produced jurisdictional uncertainty and doctrinal fragmentation, leaving those purportedly fired under Article II without a clear forum for meaningful relief.

233. These developments have produced a system that is both structurally impaired and jurisdictionally unstable. The MSPB's independence has been eroded through the removal of its members and the collapse of its bipartisan structure, while its ability to adjudicate claims now depends on shifting and internally inconsistent doctrines regarding the scope of its own authority. Taken together, these conditions leave litigants without a clear, reliable, or independent forum for resolution of their claims.

234. As of the date of this filing, multiple district courts have concluded that challenges to "Article II firings" are properly in the province of an Article III court under 28 U.S.C. § 1331.

---

[91] *See* Letter from Sarah M. Harris, Acting Solicitor Gen., to Hon. Charles E. Grassley, Chairman, S. Comm. on the Judiciary (Feb. 20, 2025).

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE FIRST AMENDMENT
### (RETALIATION FOR PERCEIVED POLITICAL AFFILIATION)
### (Against All Defendants)

235. The previous paragraphs of the Complaint are incorporated and realleged as if fully set forth herein.

236. The First Amendment to the U.S. Constitution guarantees all persons in the United States "the freedom of speech" to include expression and association. It forbids government officials from firing government employees merely for not supporting a political ideology, party, or agenda. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64–65 (1990) (citing *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980)).

237. These First Amendment protections apply regardless of whether the government's perception of a person's political affiliation is correct. *Heffernan v. City of Patterson, N.J.*, 578 U.S. 266, 268, 273 (2016).

238. Defendants' actions, as set forth above, constitute improper acts of political retribution, in violation of the First Amendment. Plaintiffs' terminations were unlawful, in part, because they were based on an incorrect perception that Plaintiffs' involvement in legitimate law enforcement activities, particularly the investigation of Trump's unlawful retention and mishandling of classified documents, was born of political motives and constituted acts of political disloyalty to Trump.

239. As set forth above, Defendants terminated Plaintiffs because of Defendants' perception that Plaintiffs' apolitical performance of their law enforcement duties, as described herein, ran afoul of the political and personal loyalty to Trump that Defendants demanded.

240. Personal partisan affiliation and political support for President Trump (or any

President) are not legal or appropriate requirements for the effective performance of Plaintiffs' duties and responsibilities at the FBI. Similarly, assumed lack of political compatibility based on an incorrect perception of Plaintiffs' past job assignments is not an appropriate basis on which to fire them. By casting Plaintiffs' work on the Plasmic Echo investigation as "politically weaponized," Defendants incorrectly presumed to know the personal political convictions of Plaintiffs and took unlawful action based on that presumption. Worse still, Defendants incorrectly concluded that those personal political convictions affected or drove their work.

241. Defendants' violation of the First Amendment directly and proximately harmed Plaintiffs by infringing upon the exercise of their constitutional rights, damaging their reputations, depriving them of their rightful status as FBI employees in good standing, eliminating their primary source of income, depriving them of health insurance, and reducing their retirement benefits.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE FIFTH AMENDMENT**
**(PROCEDURAL DUE PROCESS – PROPERTY INTEREST)**
**(Against All Defendants)**

242. The previous paragraphs of the Complaint are incorporated and realleged as if fully set forth herein.

243. The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

244. Based on the FBI's internal policies and practices including, but not limited to, the *Office of Professional Responsibility (OPR) Policy Guide,* the *FBI's Offense Codes and Penalty Guidelines*, the *Performance and Development Program Policy Guide*, and quarterly OPR emails, Plaintiffs had a legitimate expectation that they would be subject to removal from their positions

as non-probationary employees only for misconduct or other valid performance-related reasons. For each Plaintiff, the policies, rules, guidance, and understandings promulgated by the FBI justified a "legitimate claim of entitlement to continued employment absent 'sufficient cause.'" *Perry v. Sindermann*, 408 U.S. 593, 602–03 (1972); *see also Doe 1 v. Off. of the Dir. of Nat'l Intel.*, 180 F.4th 536, 546–47 (4th Cir. July 7, 2026). Thus, each Plaintiff had a protected property interest in his or her continued employment with the FBI.

245. Defendants fired all Plaintiffs without prior notice or any opportunity for a hearing or appeal. Defendants thereby deprived Plaintiffs of their property interests by terminating Plaintiffs' employment with the FBI without due process of law in violation of the Fifth Amendment.

246. Plaintiffs Bacon and Linton also had statutory removal protections which establish an entirely separate basis for a property interest. As preference-eligible military veterans, they were owed congressionally-mandated for-cause removal protections before being terminated from their jobs. *See* 5 U.S.C. § 7513.

247. In addition, by virtue of her position as a member of the FBI's SES, Bacon could be removed from her position only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." 5 U.S.C. § 7543(a).

248. Bacon had property interests in her continued employment with the FBI including, but not limited to, her salary, health insurance, retirement benefits, and other benefits.

249. Defendants' actions, as described above, unlawfully deprived Bacon of her property interests by terminating her employment without due process of law and in violation of 5 U.S.C. §§ 3151 and 7543(b), the FBI SES Policy implementing those statutory provisions, and the

Fifth Amendment. Specifically, Bacon did not receive notice that Defendants were planning to remove her from her position, an opportunity to respond to such notice, a hearing before she was terminated, or any opportunity to appeal.

250. All Plaintiffs suffered adverse and harmful effects including, but not limited to, lost or jeopardized present or future financial opportunities. Defendants' actions terminating Plaintiffs in violation of federal statutes, the FBI SES policy, and the Fifth Amendment deprived them of property without due process of law.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE SEPARATION OF POWERS**
**(Plaintiffs Bacon and Linton against Defendants Patel and FBI)**

251. The previous paragraphs of the Complaint are incorporated and realleged as if fully set forth herein.

252. Defendant Patel purported to terminate each Plaintiff pursuant to his asserted "authority as the FBI Director" and under "Article II of the United States Constitution and the laws of the United States." Ex. A. The letters of termination were signed by Defendant Patel on letterhead sent from the "Office of the Director." *Id.* But Article II affords Defendant Patel no such authority.

253. Article II of the Constitution provides authority for the President, and the President alone, to appoint principal officers, concomitant with the power to remove them at will. Plaintiffs were not principal officers, and neither the Department of Justice nor Patel is the President. To the extent Plaintiffs Bacon or Linton were inferior officers, Article II of the Constitution relegates appointment and removal to the Heads of Departments. Patel is not a Department Head, and Defendant Blanche played no role in the terminations. If Bacon and Linton were simply employees, Article II's Appointment Clause provides no authority for their summary removals by

anyone.

254. Furthermore, under Article I, Section 8, of the Constitution, Congress has the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof," and under Article II, Section 2, "Congress may by Law vest the Appointment of []inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. I § 8; *id.* art. II § 2. The Constitution thus empowers Congress to regulate and restrict the removal of inferior officers and federal employees.

255. Congress has exercised this power by creating the Civil Service Reform Act, protecting military veterans like Plaintiffs Bacon and Linton from arbitrary, politically motivated removal. Defendants' removal of Plaintiffs Bacon and Linton under a purported Article II authority thus violates authorities vested in Congress by Articles I and II of the Constitution, including the power to place limitations on the removal of inferior officers and federal employees without due process or without cause.

256. Defendants violated the separation of powers by asserting through their actions that a purported summary removal authority under Article II of the Constitution vitiates long-recognized statutory removal protections for SES (Bacon) and military veterans (Bacon and Linton).

257. Plaintiffs Bacon and Linton were neither principal officers nor political appointees. They were employees or, at most, inferior officers. In any event, Congress may restrict the removal of such inferior officers and employees, and it did so through the Civil Service Reform Act. Even assuming the President or a department head held some authority to remove Plaintiffs, a power to remove is not authority to remove them for an unlawful reason, in violation of the First

Amendment, or in disregard of the for-cause protections enacted by Congress.

258. Plaintiffs Bacon and Linton have suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm. As such, they are entitled to declaratory relief, reinstatement, an award of backpay, and any other available damages.

## VII. <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs request that the Court award them the following relief:

(1) A declaration that Defendants' actions violated Plaintiffs' First Amendment rights and order appropriate relief;

(2) A declaration that Defendants' actions violated Plaintiffs' Fifth Amendment due process rights and order appropriate relief;

(3) A declaration that Defendants' actions as to Plaintiffs Bacon and Linton violated the Separation of Powers;

(4) An order requiring Defendants to reinstate Plaintiffs to their prior positions at the FBI and enjoin Defendants from taking any further adverse personnel actions against them without providing appropriate procedural due process as required by law and the Fifth Amendment;

(5) An award of backpay and other monetary and administrative relief as appropriate;

(6) An award of the costs of this action and reasonable attorney fees under the Equal Access to Justice Act or any other applicable law; and

(7) Grant such other relief as the Court may deem just and proper.

Dated: October 15, 2026

Respectfully Submitted,

*/s/ Margaret Donovan*________________
Margaret M. Donovan (DDC No. CT0026)
Christopher M. Mattei (DDC No. CT0029)
KOSKOFF KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com
cmattei@koskoff.com

*/s/ Abbe David Lowell*_________________
Abbe David Lowell (DDC No. 358651)
Caleb Hayes-Deats (DDC No. 1643213)
Schuyler Standley (*pro hac vice forthcoming*)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
SStandley@lowellandassociates.com

*/s/ Rebecca S. Tinio*_______________
Rebecca S. Tinio (admission pending)
Daniel S. Noble (admission pending)
Ross H. Gitlin (admission pending)
KKL LLP
350 Fifth Avenue, 77th Floor
New York, NY 10118
T: (212) 390-9550
F: (212) 390-9550
Rebecca.Tinio@KKLllp.com
Daniel.Noble@KKLllp.com
Ross.Gitlin@KKLllp.com

*Attorneys for Plaintiffs*